**FERROFLUIDICS CORPORATION,**
Plaintiff, Appellee,

v.

**ADVANCED VACUUM COMPONENTS,**
**INC., et als., Defendants,**
**Appellants.**

No. 92–1594.

United States Court of Appeals,
First Circuit.

Heard June 5, 1992.

Decided Aug. 6, 1992.

Edward W. Smithers, San Jose, Cal., with whom Merrill & Broderick, Manchester, N.H., and Gibson, Dunn & Crutcher, San Jose, Cal., were on brief, for defendants, appellants.

E. Donald Dufresne, with whom George R. Moore and Devine, Millimet & Branch, Manchester, N.H., were on brief, for plaintiff, appellee.

Before CYR, Circuit Judge, RONEY,* Senior Circuit Judge, and PIERAS,** District Judge.

* Of the Eleventh Circuit, sitting by designation.

** Of the District of Puerto Rico, sitting by designation.

CYR, Circuit Judge.

Plaintiff Ferrofluidics Corporation (Ferro) is a Massachusetts corporation which has its principal place of business in New Hampshire. Ferro developed, and now makes and markets, an item called a magnetic fluid rotary seal for use in the manufacture of semiconductor chips. The magnetic fluid rotary seal is a state-of-the-art gadget, and Ferro invests upwards of a million dollars a year to refine the technology and diversify its applications. Ferro dominates the American market, accounting for about ninety-five percent of the magnetic fluid rotary seals sold in the United States.

At one time, Nippon Ferrofluidics Corporation (NFC) was Ferro's Japanese subsidiary. In 1987, Ferro sold NFC to Japanese investors. Akira Yamamura is NFC's chief executive officer. Ferro gave NFC a license to manufacture and sell its magnetic fluid rotary seals, and has since delivered to NFC updated product formulas. The license appears to limit NFC's territory to Japan and Asia. NFC, however, has disputed that territorial restriction and evidenced a desire to sell in the United States.

Ferro hired defendant Todd Sickles in December 1985 as a product manager in its "Seals Division," which handled the manufacture and marketing of magnetic fluid rotary seals. On his first day at work, Sickles signed a document that contained both a nondisclosure agreement and a covenant prohibiting him from competing with Ferro for five years after he left the company's employ (the "restrictive covenant" or the "covenant not to compete"). According to the document, both the nondisclosure provision and the restrictive covenant were to "be governed by the laws of Massachusetts," and the parties were to submit any disputes for arbitration in Boston.

Sickles prospered in his work, and Ferro eventually promoted him to general manager of the Seals Division. By 1990, however, Ferro was suffering, along with much of the New England high-tech industry, from a downturn in the economy. The company had laid off employees and cut back salaries and other benefits. Morale was low, and many employees were looking for work elsewhere. Sickles was among them. His duties as general manager included maintenance of corporate relations with NFC, and on two occasions he had been told by representatives of the Japanese company that if he ever decided to leave Ferro and wanted another job, he should get in touch with them.

Now, in 1990, Sickles took up the offer, although he had not yet left Ferro's employ. He met with Akira Yamamura, and with Yamamura's lieutenant, Dr. Goto, and began to work out a plan under which he would set up a company to market magnetic fluid rotary seals in the United States. NFC would provide both the financing and the seals—seals manufactured, it should be noted, according to the formulas supplied to NFC by Ferro itself. In other words, Sickles intended not merely to compete with his soon-to-be-former employer, but to compete with it using its own product.

Sickles did not scheme alone. At one time or another, four other Ferro employees were members of the cabal: Timothy Barton, the Northeast Regional Sales Manager of the Seals Division; defendant Perry Barker, Regional Sales Manager for the Southeast, Southwest and Rocky Mountain regions; Mark Granoff, Product Manager of the Seals Division; and Robert Kuster, then manager of Ferro's customer service department. At length, however, Granoff, afflicted by his conscience, dropped out of the group and quit his job at Ferro; Sickles rescinded the invitations to Barton and Kuster; and only Sickles and Perry Barker remained.

The planning was marked by a number of underhanded tactics. A few examples will illustrate. Sickles did much of the groundwork for the new venture on Ferro's company time using company resources, including business trips to California and Japan at Ferro's expense. In deciding where to trim his department's payroll during a second round of layoffs, Sickles spared Barton, Barker and Granoff and let the axe fall on two employees who had shown no interest in leaving Ferro and who

were not involved in the new venture. Finally, the district court found, and we have no reason to doubt, that when Sickles left Ferro he carried with him two copies of the company's customer list.

Sickles's machinations also reflect his awareness of the covenant not to compete and his concern that it might interfere with his ambitions. He received advice from lawyers on several occasions, some of which he in turn related to NFC, including the nugget that "[l]egal complications will be greatly reduced by incorporating [the new venture] in California since this state strongly protects the entrepreneur and, in general, does not recognize non-compete agreements...." Not surprisingly, then, when the new venture finally took shape in April 1991 as Advanced Vacuum Components, Inc. (AVC), it was incorporated and headquartered in California. Sickles owned 75% of the voting stock in AVC; Barker the remaining 25%.

Advanced Vacuum Components dwells in NFC's shadow, though there is no direct link between the companies. AVC obtains its magnetic fluid rotary seals from NFC through a second Japanese company, Advanced Vacuum Seals. A Hong Kong firm called Advanced Materials Research Limited, termed a "front" for NFC by the district court, is AVC's source of financing. It has paid AVC's legal fees and provided it with several hundred thousand dollars in financing; in return, Advanced Materials Research Limited receives 70% of AVC's operating income and owns preferred stock which it can convert into a controlling percentage of voting stock were AVC to go public.

Sickles and Barker quit Ferro in late May 1991 and AVC began operating soon after. Between May 1991 and the trial of this case in April 1992, AVC sold only about $34,000 worth of magnetic fluid rotary seals, a minuscule amount compared with Ferro's $7,400,000 in rotary seal sales during 1991. The district court found, however, that "AVC is a definite threat to Ferrofluidics," noting that AVC eventually expects to capture 54% of a market in which Ferro currently enjoys a 95% share.

Under the circumstances, litigation probably was inevitable. Ignoring the arbitration clause in the document containing the restrictive covenant, both sides filed lawsuits. Seemingly, AVC and Sickles won the race to the courthouse, by filing a declaratory judgment action in the United States District Court for the Northern District of California in November 1991. The complaint requested a judicial declaration invalidating the restrictive covenant under California law.

After initiating the California declaratory judgment action, however, AVC and Sickles hung fire. They did not serve the complaint on Ferro until after Ferro had filed the instant lawsuit in the United States District Court for the District of New Hampshire. Ferro's complaint, naming AVC, Sickles, Barker and Akira Yamamura as defendants, contained six counts: (1) misappropriation of trade secrets by Sickles and Barker, (2) breach of Sickles's non-disclosure agreement and covenant not to compete, (3) breach of Sickles's and Barker's fiduciary duties to Ferro, (4) false representations to Ferro customers in violation of the Lanham Act, 15 U.S.C. § 1125(a), (5) unfair competition, and (6) tortious interference, by Yamamura and AVC, with Ferro's employment contracts with Sickles and Barker, and by Yamamura, AVC, Sickles and Barker, with the employment contracts of Barton, Kuster and Granoff.

The district court heard Ferro's motion for a preliminary injunction on March 16, 1992. Rather than rule on the motion, the court set trial for March 25. As service of process could not be obtained on Yamamura during the short interval prior to trial, he was dropped as a defendant. At the same time, the defendants moved to dismiss under Fed.R.Civ.P. 19 for failure to join an indispensable party (identified not as Yamamura but as NFC).

The trial began on March 25 and lasted five days. On April 22, the district court issued its findings of fact and conclusions of law. Briefly put, the court ruled (1) that NFC was not an indispensable party under Rule 19, (2) that the enforceability of the restrictive covenant should be determined

under New Hampshire law, rather than either Massachusetts law, as specified in the document, or California law, as urged by the defendants, (3) that the five-year term of the covenant was excessive, but that the covenant should be enforced for a three-year term, (4) that Sickles had violated the covenant, and (5) that both Sickles and Barker had violated their fiduciary duties to Ferro. The court granted Ferro no relief on its other claims, but issued a permanent injunction prohibiting the defendants from engaging in the magnetic fluid rotary seal business until June 1994, 789 F.Supp. 1201 (D.N.H.1992). This appeal followed; we expedited the hearing, and now affirm.

## DISCUSSION

The defendants assert three claims on appeal: first, that the district court erred when it decided to apply New Hampshire law; second, that it erroneously modified the term of the restrictive covenant; and third, that it abused its discretion by denying defendants' motion to dismiss for failure to join an indispensable party.

### 1. *Choice of Law*

■ The district court actually made two choices concerning the law governing the restrictive covenant. First, it chose to nullify the parties' contractual choice of Massachusetts law, then to apply New Hampshire law, rather than California law as the defendants had urged. As we will explain, the first ruling probably was erroneous, but any error was harmless; the second ruling likely was unnecessary, but in any event entirely correct.

■ Where the contracting parties select the law of a particular jurisdiction to govern their affairs, as a rule New Hampshire courts will honor their choice "if the contract bears any significant relationship to that jurisdiction." *Allied Adjustment Service v. Heney,* 125 N.H. 698, 484 A.2d 1189, 1191 (1984). The *Allied Adjustment Service* court cited, and the New Hampshire rule echoes, the Restatement (Second) of Conflict of Laws § 187(2)(a), which favors enforcing the parties' contractual choice

unless "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice...."

■ The district court opinion did not address the issue head-on, but suggests that the court decided to nullify the parties' choice of Massachusetts law because New Hampshire bore a more significant relationship to the parties and their contract than Massachusetts. New Hampshire undeniably has stronger links to the transaction than Massachusetts: Ferro has its headquarters in New Hampshire, the contract was executed and performed there, and Sickles lived there while he worked for Ferro. The more significant relationship to New Hampshire nevertheless is not an adequate reason to nullify the parties' contractual choice of Massachusetts law. Absent a mutual choice of law by the parties, the law of the jurisdiction with the most significant relationship to the contract normally applies. *Consolidated Mut. Ins. Co. v. Radio Foods Corp.,* 108 N.H. 494, 240 A.2d 47, 49 (1968). When the parties take the trouble to make a contractual choice of law, often it is because they do not want to have applied, by operation of the general rule, the law of some other jurisdiction with the "most significant" relationship to the contract. If a court can nullify a contractual choice of law merely on the ground that another jurisdiction has a more significant relationship to the transaction than the chosen jurisdiction, the courts can nullify virtually any contractual choice—and do so for the very reason the parties chose to do otherwise.

The nullification analysis, as noted earlier, properly focuses on the nexus between the chosen jurisdiction and the parties or their contract; we inquire whether the chosen jurisdiction has *any* significant relationship, rather than whether another jurisdiction has a *more* significant relationship. Ferro was incorporated in Massachusetts and did a substantial amount of business there. The cases indicate that this is a sufficient bond to sustain the contractual choice of law. "A party's incorporation in a state is a contact sufficient to allow the

parties to choose that state's law to govern their contract." *Carlock v. Pillsbury Co.*, 719 F.Supp. 791, 807 (D.Minn.1989). *See also Gray v. American Express Co.*, 743 F.2d 10, 17 (D.C.Cir.1984); *Hale v. Co–Mar Offshore Corp.*, 588 F.Supp. 1212, 1215 (W.D.La.1984); Restatement (Second) of Conflict of Laws, § 187 comment f (fact that one party is domiciled in chosen jurisdiction provides "reasonable basis" for their choice).

Although the preceding exposition suggests that it may have been appropriate to enforce the contractual choice of Massachusetts law, we need not determine the matter definitively if, as the district court found, New Hampshire is the jurisdiction with the most significant relationship to the transaction. As explained below, this is so because both Massachusetts and New Hampshire law lead to the same result in the instant case.

■ The defendants argue, however, that even though the district court correctly cast off from the mooring of the parties' contractual choice, the currents of the "most significant relationship" test should have carried it to California, not New Hampshire. Unlike the courts of New Hampshire and Massachusetts, California courts almost invariably refuse to enforce restrictive covenants. *See Scott v. Snelling and Snelling, Inc.*, 732 F.Supp. 1034, 1042–43 (N.D.Cal.1990). Thus, were California, rather than New Hampshire, the appropriate alternative under the "most significant relationship" test, it would be necessary to determine whether the district court correctly nullified the contractual choice-of-law provision.

It is very clear, however, that California does not trump New Hampshire. Since the "most significant relationship" test is intended to give "effect to the intention of the parties and their reasonably justified expectations," *Consolidated Mut. Ins. Co.*, 240 A.2d at 49, the court applying it must examine the jurisdiction/contract relationship at the time the contract was executed. In this case, Ferro and Sickles could have had no reasonably justifiable expectation in December 1985 that their agreement would

be governed by California law, as California bore no relationship to the contract at that time, and continued to have none until Sickles breached the restrictive covenant there in 1991. New Hampshire, on the other hand, was both the place of execution and the place of anticipated performance. If the parties had any reasonably justified expectation in December 1985 (other than that their choice of Massachusetts law be enforced), it would have been that the covenant be governed by New Hampshire law.

Viewed in the best light, the defendants' argument is that since Sickles *presently* lives and works there, California has an interest in how his rights are interpreted and enforced. Quite true, but of course such an interest hardly suggests that California had a more significant relationship than New Hampshire with an employment contract performed in New Hampshire by a New Hampshire employer and a New Hampshire employee throughout the employment period. *See* Restatement (Second) of Conflict of Law § 196 (contracts for rendition of services usually governed by law of state where the contract requires that the services be rendered). "While [California] certainly has a strong interest in monitoring effects on in-state competition, [New Hampshire] has an equally strong interest in protecting [New Hampshire] businesses from breaches of employment agreements and consequent losses of good will." *Shipley Co. v. Clark*, 728 F.Supp. 818, 826 (D.Mass.1990). In sum, even assuming the district court properly could have nullified the contractual choice of law, in these circumstances it could have done so only in favor of New Hampshire law.

### 2. *Enforcement of Restrictive Covenant*

■ Massachusetts and New Hampshire will enforce reasonable restrictive covenants in employment contracts under essentially the same reasonableness standard. In Massachusetts, a restrictive covenant "is not invalid and may be enforced in equity provided it is necessary for the protection of the employer, is reasonably limited in time and space, and is consonant with

the public interest." *Novelty Bias Binding Co. v. Shevrin*, 342 Mass. 714, 175 N.E.2d 374, 375 (1961). In New Hampshire, a restrictive covenant is considered reasonable so long as it is "no greater than necessary for the protection of the employer's legitimate interest, does not impose undue hardship on the employee, and is not injurious to the public interest." *Moore v. Dover Veterinary Hospital, Inc.*, 116 N.H. 680, 367 A.2d 1044, 1047 (1976).

■ The district court ruled that the restrictive covenant in Sickles's employment contract was enforceable in all but one respect; the five-year term was found excessive. The reasonableness of a covenant presents a question of law, *see Technical Aid Corp. v. Allen*, 134 N.H. 1, 591 A.2d 262, 265 (1991), but insofar as it entails the resolution of issues of fact, a "mixed" question is presented which we review only for "clear error." *See Deguio v. United States*, 920 F.2d 103, 105 (1st Cir.1990).

We agree with the district court's assessment that the restrictive covenant was reasonable in the circumstances, except for its five-year term. The closer question is whether the district court permissibly modified the term of the covenant.

Courts presented with restrictive covenants containing unenforceable provisions have taken three approaches: (1) the "all or nothing" approach, which would void the restrictive covenant entirely if any part is unenforceable, (2) the "blue pencil" approach, which enables the court to enforce the reasonable terms provided the covenant remains grammatically coherent once its unreasonable provisions are excised, and (3) the "partial enforcement" approach, which reforms and enforces the restrictive covenant *to the extent it is reasonable,* unless the "circumstances indicate bad faith or deliberate overreaching" on the part of the employer. *Durapin, Inc. v. American Products, Inc.*, 559 A.2d 1051, 1058 (R.I.1989).

Massachusetts and New Hampshire are firmly in the "partial enforcement" camp. "Massachusetts courts will not invalidate an unreasonable noncompete covenant completely but will enforce it to the extent that

it is reasonable." *L.G. Balfour Co. v. McGinnis*, 759 F.Supp. 840, 845 (D.D.C. 1991). In New Hampshire, "[e]ven if the trial court determines that the covenant is unreasonable, the employer nonetheless may be entitled to equitable relief in the form of reformation or partial enforcement of an overly broad covenant upon a showing of his exercise of good faith in the execution of the employment contract." *Smith, Batchelder & Rugg v. Foster*, 119 N.H. 679, 406 A.2d 1310, 1311 (1979).

The defendants argue that the district court impermissibly reformed the restrictive covenant in Sickles's contract since the prerequisite "good faith" had not been established. Defendants cite the *Smith, Batchelder* and *Technical Aid* cases for the proposition that good faith cannot be found where, "as here, the employee was presented with and required to sign the restrictive covenant only after he had accepted the new position and left his former job in reliance on an earlier oral agreement for employment containing no such term." In other words, the defendants contend that the lack of advance notice to Sickles so tainted the restrictive covenant as to preclude a finding of good faith.

The district court did find, however, that Ferro had given Sickles advance notice of the restrictive covenant. We may disturb its finding only if "clearly erroneous." According to the defendants, the finding of advance notice was clearly erroneous because (1) it was based on a letter sent to Sickles by Ferro on November 18, 1985 (three weeks before he began work at Ferro and executed the restrictive covenant), (2) the November 18 letter merely informed Sickles that he would be required to "sign a nondisclosure agreement covering the proprietary activities of the corporation," and (3) the letter made no explicit mention that the "nondisclosure agreement" would contain a clause restricting Sickles's ability to compete with Ferro. Although defendants' argument is not without some force, we need not determine whether we are, "on the entire evidence[,] ... left with the definite and firm conviction that a mistake has been committed." *United States v. United*

*States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). The defendants' perspective, we think, is altogether too limited.

In this juridical cranny, "[p]recedents are of little value." *Reddy v. Community Health Foundation of Man*, 171 W.Va. 368, 298 S.E.2d 906, 913 n. 4 (1982) (quoting 54 Am.Jur.2d, *Monopolies, Restraints of Trade, and Unfair Trade Practices*, § 543). *See also Novelty Bias Binding Co.*, 175 N.E.2d at 376 ("What is reasonable depends on the facts in each case."). In urging that we cleave reflexively to the narrow holdings of two New Hampshire cases, which turned on the presence or absence of advance notice, defendants ignore the breadth of the "good faith" concept, the variety of factors (including, but not only, advance notice) which may be material to the "good faith" determination, and the deference due a district court order for partial enforcement of a restrictive covenant.

■ The New Hampshire courts have adopted the "good faith" requirement in the Restatement (Second) of Contracts § 184(2), and such cases as *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544 (1975), *Insurance Center, Inc. v. Taylor*, 94 Idaho 896, 499 P.2d 1252 (1972), and *Solari Indus., Inc. v. Malady*, 55 N.J. 571, 264 A.2d 53 (1970). *See Smith, Batchelder & Rugg*, 406 A.2d at 1313 (citing cases). These sources tell us that "good faith" and "advance notice" are not coextensive concepts, but rather that "good faith" denotes a broader and more complex principle reflecting the reformation doctrine's origin in the courts' "inherent equity powers to modify and enforce covenants." *Durapin, Inc.*, 559 A.2d at 1058. In order to give form to this principle, the trial courts are charged to examine and consider *all* relevant circumstances, and only then to determine whether, in light of all those circumstances, it would be equitable to enforce the covenant in modified form. *See Raimonde*, 325 N.E.2d at 547. The aim in each case must be to determine whether partial enforcement is "the fair and reason-

able course." *Solari Indus.*, 264 A.2d at 56.

To be sure, the timing of the initial presentation of the restrictive covenant to the employee may bear on the employer's good faith. The absence of notice may suggest overreaching and bad faith, insofar as it places the employee in a weaker bargaining position with respect to the covenant than he might have enjoyed had he known of the proposed restriction earlier; for example, before he left his previous job. Thus, in the *Technical Aid* case, the New Hampshire Supreme Court found no error in the trial court determination that an employer lacked good faith where the employer had presented the covenant to the employee on his first day on the job, and the employer insisted that the employee sign immediately. 591 A.2d at 271. *See also American Credit Bureau, Inc. v. Carter*, 11 Ariz. App. 145, 462 P.2d 838 (1969) (no abuse of discretion in trial court refusal to enforce restrictive covenant where employer had not told employee about covenant until after employee quit former job).

These cases say that the lack of advance notice may justify a finding of bad faith, but not that the trial court cannot find good faith absent advance notice. An exclusive preoccupation with the timing of the presentation of the restrictive covenant, and more precisely with its effect on the bargaining-power balance between employer and employee, would limit unrealistically the broad equitable inquiry contemplated in these matters. The fact is, of course, that restrictive covenants, whenever and however presented to the employee, "often are not arrived at by bargaining between equals ... [t]he employer normally presents the terms on a 'take it or leave it' basis." *Cheney v. Automatic Sprinkler Corp.*, 377 Mass. 141, 385 N.E.2d 961, 965 (1979).

■ The object of the appropriate inquiry, therefore, is not so much whether the employer has upset the balance in bargaining power, as whether the employer has exploited an inherent imbalance by placing "deliberately unreasonable and oppressive" restraints on the employee. *So-*

*lari Indus.,* 264 A.2d at 57. In their pursuit of that inquiry, the courts may, and in appropriate circumstances should, examine and weigh other relevant considerations. These other considerations include whether the employer's general practice with respect to employee restraints "is fair and designed only to protect legitimate interests," Blake, *Employee Agreements Not to Compete,* 73 Harv.L.Rev. 625, 683 (1960); whether the employer gave the particular employee a reasonable opportunity to read and understand the covenant; whether the employer allowed (or, if asked, would have allowed) the employee to obtain modifications of the covenant, or to decline to execute it altogether; and whether the terms of the restrictive covenant are so "savage ... that their overbreadth operates, by *in terrorem* effect, to subjugate employees unaware of the tentative nature of such a covenant," *Reddy,* 298 S.E.2d at 916, or, conversely, whether the terms are merely marginally overbearing so as to suggest that the employer simply miscalculated the extent of the restrictions required for its reasonable protection.

Intrinsic to any appellate assessment of these factors is the standard of review. As a trial court decision to modify and enforce a restrictive covenant is undertaken in the exercise of its equitable powers, we review only for abuse of discretion. *Morgan v. Kerrigan,* 523 F.2d 917, 921 (1st Cir.1975). Under this deferential standard, we conclude that the district court decision to modify Sickles's restrictive covenant is sustainable on the following grounds. First, were we to assume that the district court made a mistake when it found that explicit advance notice of the covenant not to compete was contained in the November 18 letter, we nonetheless think it indisputable that the letter alerted Sickles that Ferro would expect *some* restriction upon his post-employment freedom. Second, Ferro's general practice with respect to restrictive covenants does not display the kind of "grasping or negligent" behavior that may cause courts to decline partial enforcement. Blake, *supra,* 73 Harv.L.Rev. at 684. Ferro regularly requests new employees to accept restrictive covenants similar to the one Sickles executed. It invariably gives the employee, as in Sickles's case, an opportunity to read and to understand the document before signing it. Furthermore, Ferro has, on request, proven willing to consider and accept modifications. At least once—in the case of defendant Perry Barker—Ferro hired and continued to employ a worker who pocketed the document and never signed it. In at least one other instance, Ferro waived its rights under a restrictive covenant and allowed a former employee to join a competitor where the employee—in marked contrast to Sickles—was forthright in his dealings and made no attempt to deceive Ferro about his intentions. Finally, and perhaps most importantly, the covenant was flawed only as concerned the remoteness of its termination date, and the restrictions as a whole were not so harsh as to warrant an inference that Ferro meant to enserf its employee.

Considerations of "reasonableness" and "balance" pervade the caselaw in "partial enforcement" jurisdictions. *See, e.g., Reddy,* 298 S.E.2d at 911 (discussing "rule of reason"); *see also* Arthur A. Corbin, *Contracts,* § 1394 at 89 (1962) ("It is the function of the law to maintain a reasonable balance"). Courts in these jurisdictions must be vigilant to protect employees against overbroad and oppressive restrictions on their ability to work and earn a living, but must temper their vigilance with an awareness that employers, too, work for a living and are entitled to reasonable protection against the predations of unscrupulous former employees. *See id.* at § 1394; *see also Raimonde,* 325 N.E.2d at 547 ("Most employers who enter contracts do so in good faith, and seek only to protect legitimate interests"). Notwithstanding the serious question defendants raise concerning advance notice, and regardless whether Massachusetts or New Hampshire law governs, we conclude, in the circumstances of this case and in light of its considerable discretion to mold equitable relief, that the district court decision must stand.

### 3. *Joinder*

We need not linger over the defendants' final claim. Defendants contend that the present action should have been dismissed because NFC was a necessary and indispensable party under Fed.R.Civ.P. 19. First, defendants argue that NFC was a "necessary party" under Rule 19(a)(2)(i)—that is, that NFC "claims an interest relating to the subject of the action and is so situated that the disposition of the action in [its] absence may … as a practical matter impair or impede [its] ability to protect that interest. . . ." They insist that an injunction against AVC would deprive NFC of the ability to sell magnetic fluid rotary seals to its American protege: "NFC claims a right to market seals [in the United States] under the license agreement [with Ferro], which has been 'impaired or impeded' by Ferro's lawsuit … NFC's ability to market seals would be greatly curtailed by enjoining AVC."

Whatever abstract appeal it may have, their argument breeds an incongruity in the present case. If NFC actually was a "necessary party" under Rule 19(a)(2)(i)—that is, if its practical ability to protect an interest was at stake, and it could not be adequately represented by AVC—then there would have been no need to resort to joinder, as NFC would also have been entitled to intervene as a matter of right under Fed.R.Civ.P. 24(a). *See Pujol v. Shearson American Express, Inc.*, 877 F.2d 132, 135 (1st Cir.1989), and cases cited therein (Rule 24(a)(2) is a "counterpart" to Rule 19(a)(2)(i)). Yet NFC made no attempt to intervene. *See Boston Car Co. v. Acura Automobile Division, American Honda Motor Co.*, 127 F.R.D. 434, 435 (D.Mass. 1989) (party is not "necessary" where it "has not claimed an interest" in outcome of action).

In any event, NFC's potential economic exposure did not qualify it as an "indispensable party" under Rule 19(b). "[I]t is generally recognized that a person does not become indispensable to an action to determine rights under a contract simply because that person's rights or obligations under an entirely separate contract will be affected by the result of the action." *Helzberg's Diamond Shops, Inc. v. Valley West Des Moines Shopping Center, Inc.*, 564 F.2d 816, 820 (8th Cir.1977). *See also Boston Car Co.*, 127 F.R.D. at 435.

*Affirmed.*