Ayoob v. Cor-Bon, et al.          CV-96-464-B    02/04/99

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Dorothy Ayoob and**
**Massad Ayoob**

    **v.**                      Civil No. C-96-464-B

**Cor-Bon Custom Bullet Company,**
**and Peter Pi, individually**


## MEMORANDUM AND ORDER


This case arises from a distributorship agreement between Cor-Bon, Inc., a manufacturer of high performance ammunition, and Armor of New Hampshire, a sole proprietorship owned and operated by Dorothy Ayoob.  Dorothy Ayoob and her husband, Massad Ayoob, seek damages and equitable relief from Cor-Bon and its president, Peter Pi, claiming that Cor-Bon breached the distributorship agreement by failing to pay commissions that were due pursuant to the agreement, and by attempting to unilaterally add terms to the agreement that the Ayoobs find unacceptable.  The Ayoobs also assert several tort claims, claims for equitable relief and a claim based on New Hampshire's Consumer Protection Act arising from the same course of conduct.  Finally, they make a claim for breach of warranty based on Cor-Bon's alleged failure to deliver ammunition of an acceptable quality.

Cor-Bon and Pi have filed a motion for partial summary judgment arguing that: (1) Massad Ayoob lacks standing to assert any claims against defendants; (2) to the extent that plaintiffs' breach of contract claim is based on violations that accrued more than three years before the complaint was filed, it is barred by the statute of limitations; (3) plaintiffs cannot maintain a breach of contract claim for alleged breaches that accrued after January 1, 1996, as Cor-Bon lawfully terminated its contract with Armor on that date; (4) plaintiffs are not entitled to maintain any quasi-contract claims because the parties' relationship is governed by an actual contract; (5) plaintiffs' claims for interference with a contractual relationship fail for several reasons; (6) plaintiffs' common law claim of unfair competition and its Consumer Protection Act claim fail to state claims for relief; and (7) the evidence will not support a breach of warranty claim. Embedded in this dispute is a choice of law question as to whether plaintiffs' claims are governed by Michigan or New Hampshire law. I examine this issue first after sketching out the relevant background facts.

# I.  BACKGROUND[1]

In 1985, Peter Pi and Massad Ayoob entered into an oral contract granting Armor the exclusive right to distribute Cor-Bon ammunition.  The parties modified the contract in 1990 when Cor-Bon added Firearms of Seattle ("FOS") as a second distributor.  Thereafter, Armor and Cor-Bon orally agreed that Armor would serve as Cor-Bon's exclusive distributor in the United States, east of the Mississippi River, and that FOS would have the western part of the United States as its territory.  Cor-Bon also agreed that Armor (1) would retain the exclusive right to distribute Cor-Bon's products outside the United States, (2) would be the only buyer entitled to purchase products at distributor prices, and (3) would continue to have the right to sell Cor-Bon's products at retail across the country.

The Ayoobs have taken differing positions concerning their understanding of the term during which the distributorship agreement would remain in effect.  In some statements, the Ayoobs claim that the parties never discussed the length of the agreement.  At other times, they claim that Cor-Bon agreed that the agreement would continue in perpetuity.  They also contend

---

[1]  I describe the background facts in the light most favorable to the plaintiffs.

that the parties never discussed the circumstances under which one party could terminate the agreement over the other party's objection.

The parties orally modified the distributorship agreement in 1992. Under the modified contract, Armor and FOS agreed to serve as "master distributors." As master distributors, they would continue to collect commissions on their own sales but they were also entitled to a 5% commission on sales by "sub-distributors" within each master distributor's territory. Firearms Academy of Florida ("FAS") and D&S Enterprises ("D&S") became Armor's sub-distributors pursuant to the 1992 contract modification.

Efforts were made in 1993 to replace the parties' oral agreement with a written contract. Toward this end, Pi, on behalf of Cor-Bon, sent Armor a proposed agreement. The agreement contained the following pertinent terms:

> 4. Distributors may not market or solicit customers outside their assigned territories. If a distributor is currently selling a dealer outside of their territory, it may keep that dealer if that dealer prefers to buy from them. . . .

7. In gratitude for being my first distributors and for helping me get started Cor-Bon will issue a five percent credit to its master distributors from the sales of its regional distributors high performance ammunition. This credit can only be applied to advertising invoices. This credit will be valid only for the period of time below: Armor of New Hampshire: Jan 1, 1993 to Dec 31, 1997 (5 years); Firearms Academy of Seattle: Jan 1, 1993 to Dec 31, 1995 (3 years).

14. Credit will be a privilege with Cor-Bon. Cor-Bon <u>must</u> <u>receive</u> payment on all invoices by the due date.

15. A credit ceiling will be established for each distributor. It will be set on an individual basis by Cor-Bon taking into consideration payment history and sales volume.

2-11 Cor-Bon reserves the right to amend this agreement to cover any unforeseen changes in the future business climate.

The 1993 Agreement included no language about duration or termination.

Taking exception to the language in the proposed agreement that would have restricted Armor's use of its subdistributor commissions to payment of advertising invoices, Armor refused to continue as a Cor-Bon distributor. Dorothy Ayoob informed Pi of her decision, after which Pi allegedly told her that Armor could continue its unrestricted use of the subdistributor commissions. See <u>id.</u> at 158. Further, according to Massad Ayoob,

"[m]y understanding as far as the advertising credits was that simply that was a convenience to him [Pi] because of his cash flow situation . . . I had never understood that to be a conditional thing or the only way in which the commissions would ever be delivered. In fact the commissions were delivered in other forms."

Id. The Ayoobs never signed the proposed contract.

The parties orally modified the distributorship agreement again in 1994, when Cor-Bon added Lew Horton, Inc. ("Horton") as a new distributor. Horton was a large national distributor located in the heart of Armor's territory. To address Armor's concerns that Horton's addition would adversely affect its sales and the sales of its sub-distributors, the parties agreed that Armor would receive a 7% commission on Horton's sales of Cor-Bon's ammunition.[2]

Notwithstanding its agreement with Armor, Cor-Bon began selling ammunition directly to Horton in 1994 without paying Armor its 7% commission. In 1995, Cor-Bon also began to direct sales orders received via its toll-free number to the Cor-Bon factory instead of routing them to the nearest distributor, as had formerly been Cor-Bon's practice. This allowed Cor-Bon to avoid paying commissions that it owed Armor under the

---

[2] Massad Ayoob has testified that the parties agreed that the commission paid would vary between 7% and 10%, depending upon whether ammunition was shipped to Horton directly by Cor-Bon or whether it was shipped by Armor.

distributorship agreement.  In 1995, Cor-Bon also added Nationwide of Pennsylvania ("NOP") as a new distributor in Armor's territory, but refused to pay Armor any commissions on sales by NOP.

By the end of 1995, several of Cor-Bon's distributors had fallen behind in their invoice payments, resulting in severe cash flow problems for Cor-Bon.  As a result, Cor-Bon became unable to obtain component parts for its ammunition.  At one point, Cor-Bon was $38,000 overdrawn at the bank as a result of the non-receipt of promised payments from distributors, and could not afford to advertise.

Allegedly as the result of these problems, Cor-Bon unilaterally instituted a new distributor agreement on January 1, 1996 which it called the "1996 Wholesale Program."  This new distributorship agreement eliminated all exclusive territories for individual distributors and allowed any distributor to market Cor-Bon products anywhere in the United States.  It set a credit limit for each distributor, and explicitly stated that outstanding orders would not be released to any distributor with past due invoices, or any distributor which had exceeded its credit limit.  Advertising credits were also made available to all distributors who wanted them and could meet the sales volume

requirement.

Armor found the terms of this new agreement "highly objectionable." Nevertheless, because Armor's customers were still clamoring for Cor-Bon ammunition and the parties were continuing to negotiate, Armor placed another order with Cor-Bon after Cor-Bon instituted the 1996 Wholesale Program. Because Cor-Bon claimed that Armor was in arrears on its invoice payments, however, it told Armor that it would only ship the ammunition to Armor C.O.D. Armor disagreed with Cor-Bon's suggestion that it was behind on its invoice payments, insisting instead that Cor-Bon owed Armor unpaid commissions. Cor-Bon then, apparently for the first time, denied that it owed Armor anything. Negotiations between the parties subsequently broke down, and the Ayoobs brought suit against Cor-Bon and Peter Pi on September 5, 1996.

## II. <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c). "On a motion for summary judgment, [I] recite the facts in a light most favorable to the nonmovant." Thomas v. Contoocook Valley School District, 150 F.3d 31, 33 (1st Cir. 1998).

## III. DISCUSSION

Plaintiffs bring an eight-count complaint against Cor-Bon and Peter Pi seeking a variety of contract and tort remedies arising from the parties' distributorship agreement. Counts 1, 2, 3, and 7, assert claims for breach of contract and quasi-contractual relief. Counts 4, 5, and 6, allege that defendants tortuously interfered with Armor's existing and prospective business relations and engaged in deceptive or fraudulent business practices. Count 8 alleges that Cor-Bon breached the implied warranty of merchantability and/or fitness by selling Armor defective and/or mislabeled ammunition.

Although the Ayoobs have lived and worked in New Hampshire for several years, Cor-Bon was incorporated in Michigan and was based there when the events giving rise to the complaint occurred. Accordingly, I must first determine whether the Ayoobs' claims are governed by New Hampshire or Michigan law.

## A.   Choice of Law

I apply the forum state's choice of law rules when, as in this case, federal jurisdiction is based on diversity of citizenship.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); American Title Ins. Co. v. East West Fin. Corp., 959 F.2d 345, 348 (1st Cir. 1992).

The New Hampshire Supreme Court uses slightly different choice of law tests for contract and tort claims.  With respect to contract claims, the court has determined that "in the absence of an express choice of law validly made by the parties, the contract is to be governed, both as to validity and performance, by the law of the state with which the contract has its most significant relationship."  Currier v. Tuck, 112 N.H. 10,11 (1972)(quoting Consolidated Mut. Cas. Co. v. Radio Foods Co., 108 N.H. 494, 496, (1968)); see also Glowski v. Allstate Ins. Co., 134 N.H. 196, 197 (1991).  In tort actions, in contrast, the New Hampshire Supreme Court applies the "Leflar" test first enunciated in Clark v. Clark, 107 N.H. 351, 353-55 (1966).  See Keeton v. Hustler Magazine, Inc., 131 N.H. 6, 14 (1988).  I examine each class of claims in turn.

## 1.    Contract Claims

According to the Restatement (Second) of Conflicts of Law, adopted by the New Hampshire Supreme Court to govern choice of law questions presented by contract claims,

> "In the absence of an effective choice of law by the parties, the contacts to be taken in to account . . . to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.  These contacts are to be evaluated according to their relative importance with respect to the particular issue."

Restatement (Second) of Conflicts of Law § 108; see also, Glowski, 134 N.H. at 197 ("Our post-Clark decisions, particularly in contracts cases, have relied upon the approach taken by the Restatement (Second) of Conflict of Laws. . .").  Further, since the most significant relationship test is intended to "give effect to the intention of the parties and their reasonably justified expectations, the court applying it must examine the jurisdiction/contract relationship at the time the contract was executed."  Ferrofluidicse Corp. v. Advanced Vacuum Components, Inc., 968 F.2d 1463, 1468 (1st Cir. 1992) (internal citation omitted).

While good arguments can be made for the application of either New Hampshire or Michigan law to plaintiffs' contract and quasi-contract claims, I apply New Hampshire law because I conclude that New Hampshire has the most significant relationship to the contract at issue. First, Dorothy Ayoob, the sole proprietor of Armor, lives in New Hampshire. Second, it appears hat the Ayoobs negotiated the distributorship agreement with Cor-Bon from New Hampshire. Third, Armor distributed Cor-Bon's products from its base of operations in New Hampshire. Thus, it is reasonable to characterize New Hampshire as (1) the place of plaintiff's domicile; (2) one of the places of contracting; (3) the primary place where the contract was performed; and (4) the principal place where the subject matter of the contract was located. While the fact that Cor-Bon was based in Michigan when the contract was formed favors the application of Michigan law, this fact is not sufficiently important to outweigh the other factors favoring the application of New Hampshire law. Accordingly, I conclude that plaintiff's contract and quasi-contract claims are governed by New Hampshire law.

## 2. Tort Claims

The factors that a court must consider in resolving a choice of law question concerning a tort claim are: (1) the

predictability of results; (2) the maintenance of reasonable orderliness and good relationships among the states in the federal system; (3) simplification of the judicial task; (4) advancement of the governmental interest of the forum; and (5) the court's preference for what it regards as the sounder rule of law. See Clark, 107 N.H. at 353-55. Here, the only factor that significantly affects the analysis is the strong governmental interest that New Hampshire has in protecting a resident from torts committed by an out-of-state defendant. As none of the other factors suggest that Michigan law should govern plaintiffs' tort claims, I conclude that these claims are also governed by New Hampshire law.

B. **Massad Ayoob's Standing to Sue**

Both constitutional and prudential considerations potentially constrain a plaintiff's standing to sue in federal court. See Bennett v. Spear, 117 S. Ct 1154, 1161 (1997). The Supreme Court has determined that the "irreducible constitutional minimum of standing" consists of three requirements: (1) the plaintiff must have personally suffered an "injury in fact" which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the cause of the plaintiff's alleged injury must be "fairly . . . traceable" to the defendant;

and (3) the injury must be "redress[able] by a favorable decision." Id. at 1163 (internal citations omitted)(quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). The plaintiff bears the burden of meeting these requirements. See Berner v. Delahanty, 129 F.3d 20, 23-24 (1st Cir. 1997), cert. denied, 118 S. Ct. 1305 (1998).

Armor is a sole proprietorship owned by Dorothy Ayoob. Although Massad Ayoob is authorized to speak and act on Armor's behalf, he has no ownership interest in Armor, was never an "employee" of Armor, and spent less than five percent of his time between 1985-95 on Armor business. See Dep. of Massad Ayoob at 30. His primary activity on behalf of Armor was to use his expertise as an ammunitions expert to answer technical questions regarding Cor-Bon ammunition for Armor customers. See id. at 31-32. As a non-owner, non-employee of Armor, Massad Ayoob has not alleged that he has personally suffered any particularized, actual or imminent "injury in fact" to give him Article III standing in this case. See e.g. Sierra Club v. Morton, 405 U.S. 727, 739 (1972)("a mere 'interest in a problem,' no matter how long standing the interest . . . is not sufficient" injury to confer standing); New Hampshire Bankers Ass'n v. Nelson, 113 N.H. 127, 128-29 (1973)(third party's injury must be direct, not

derivative - no legally cognizable interest found where a third-party's claim for monetary damages derived from the plaintiff's alleged injuries and would not exist independent of the plaintiff's claim).[3]

In light of these findings, I have reconsidered my bench order of November 2, 1998, and now dismiss Massad Ayoob as a party plaintiff.

## C.  Contract Claim

### 1.  Statute of Limitations

Defendants argue that Ayoob's breach of contract claim is barred by New Hampshire's three-year statute of limitations to the extent that her claim accrued prior to September 6, 1993.  I decline to address the merits of this contention as the current record does not contain sufficient information for me to determine whether plaintiff has asserted a claim for breach of

---

[3] Massad Ayoob has alleged no connection to the contract or tort claims brought in this case to make him an interested party for purposes of standing.  Although he did state that he had been "defamed, slandered, and falsely accused" in his deposition, see Dep. of Massad Ayoob at 119, no defamation or other reputational claim is included in this action.  Instead, his pecuniary damages are realized only through his wife's loss of income from her solely-owned business.  As such, even if this case were brought in state court beyond the reach of Article III standing doctrine, Massad Ayoob has not identified any facts which would permit his recovery on any of the claims presently in the case under state law.  Accordingly, I dismiss these claims with prejudice.

-15-

contract that accrued prior to September 1993.

The record contains ample evidence to support Ayoob's claim that Cor-Bon breached its oral distributorship agreement with Armor in 1994 when it began selling ammunition directly to Horton without paying Armor the 7 percent commission it was owed under the agreement. I have not been presented with sufficient evidence, however, to support a conclusion that Cor-Bon breached the distributorship agreement prior to this date. As the record does not contain such evidence, I decline to address defendants' statute of limitations defense.

### 2. Defendants' Claim that the Agreement Was Terminated on January 1, 1996

Defendants argue that Armor cannot maintain any claim for breach of contract after January 1, 1996 because Cor-Bon lawfully terminated the contract on that date when it unilaterally replaced the oral distributorship agreement with the "1996 Wholesale Program." Ayoob responds by arguing that Cor-Bon lacked the authority to unilaterally terminate the agreement.

New Hampshire law recognizes that "[b]rokerage or agency agreements for indefinite, unspecified periods are terminable by either party at will, subject to the requirement of good faith." Badr Export and Import, Inc. v. Groveton Papers Co., 122 N.H. 101, 103 (1982). Good faith simply requires that a party, in the

-16-

exercise of the discretion afforded to it by the contract, must "observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting" [and measured by] community standards of honesty, decency, and reasonableness. Centronics Corp. v. Genicom Corp., 132 N.H. 133, 143-44 (1989).

The record in this case contains no evidence suggesting that Cor-Bon instituted its 1996 Wholesale Program in bad faith. Accordingly, if Cor-Bon can establish at trial that the oral distributorship contract was for an undefined term, it will be entitled to bar Armor from asserting any breach of contract claim that accrued after the 1996 Wholesale Program was instituted. I cannot award Cor-Bon summary judgment on this issue now, however, because a genuine factual dispute exists as to whether the distributorship contract was a contract for an undefined term as defendants claim, or a contract in perpetuity. Dorothy Ayoob testified that "Peter [Pi] said we had it [the distributorship agreement] forever . . . . Peter told me on the phone . . . way back in the early beginning when we first started . . . he said it was an exclusive distributorship and it would go on forever." Dep. of Dorothy Ayoob at 164-65. If Ayoob is able to prove this contention at trial, the distributorship agreement would not be

an agreement for an undefined term that is terminable at will.[4]
Accordingly, I deny defendants' motion for summary judgment on
this issue.

## D.    Quasi-Contract Claims

Ayoob cannot maintain claims for quasi-contractual relief if
her claims are governed by an express contract.  See Tentindo v.
Locke Lake Colony Ass'n, 120 N.H. 593, 597 (1980); 17 C.J.S.
Contracts § 6 (1963).  I cannot grant defendants' motion for
summary judgment with respect to Ayoob's quasi-contract claims,
however, because Ayoob may be entitled to assert a claim for
quasi-contractual relief if I later determine that her contract
claim is barred by the statute of frauds.  See State v. Haley, 94
N.H. 69, 69 (1946).  Accordingly, I deny defendants' motion for
summary judgment with respect to Ayoob's quasi-contract claims.

## E.    Tort Claims

### 1.    Tortuous Interference Claim

To prove a claim for tortuous interference with current or

---

[4] If the distributorship contract is deemed to be a
contract that was intended to exist in perpetuity, it is likely
that the contract would be unenforceable because of the statute
of frauds.  See N.H. Rev. Stat. Ann. § 506:2; Davis v. Grimes, 87
N.H. 133, 135 (1934); Phillips v. Verax Corp., 138 N.H. 240, 245
(1994); Lago & Sons Dairy, Inc. v. H.P. Hood, CV-92-200 (D.N.H.
June 20, 1995) at 4.  I do not reach the merits of the statute of
frauds question, however, as it has not been briefed by the
parties.

prospective contractual relations, Ayoob must establish (1) that Armor had an economic relationship with a third party; (2) that Cor-Bon knew about this relationship; (3) that Cor-Bon intentionally and improperly interfered with the relationship between Armor and the third-party; and (4) that plaintiff was damaged by such interference. See Demetracopoulos v. Wilson, 138 N.H. 371, 373 (1994); Roberts v. General Motors Corp., 138 N.H. 532, 539 (1994).

Ayoob alleges that the defendants intentionally and improperly interfered with her prospective economic relationships by unilaterally and without notice rerouting telephone calls intended for Armor to the defendants' factory and keeping the business generated by these calls for itself. Under the previously operational toll-free switching system instituted by Cor-Bon, dealers and customers seeking to purchase Cor-Bon ammunition called a single, nationally-advertised 800-number, and the system automatically routed the calls to the nearest distributor. Without warning, telephone sales and inquiries dropped precipitously, and Ayoob noticed that the 800-number which accessed the switching system was absent from Cor-Bon's national advertising.

This claim merely attempts to recharacterize Ayoob's contract claim as a tort claim. To the extent that Armor had an exclusive contractual right to service a particular geographic area, Ayoob will be entitled to recover damages from Cor-Bon for breach of contract. Under New Hampshire law, however, a tort claim cannot arise merely from an alleged breach of contract. See Lawton v. Great Southwest Fire Ins. Co., 118 N.H. 607, 613 (1978). In order to impose tort liability, the defendant's actions must "constitute a breach of a duty owed by the defendant to the plaintiff independent of the contract . . . ." Id. Here, Armor's right to any commissions was purely contractual. Accordingly, no cause of action lies against defendants in tort on this claim.

### 2. Deceptive/Fraudulent Business Practice Claims

Armor suggests that, on at least three occasions, it received shipments of ammunition from Cor-Bon that had reportedly been back-ordered but which had been manufactured by Cor-Bon months before Armor's orders were placed, as indicated by the date stamp placed on the ammunition at the factory. Armor also alleges that on several other occasions, Cor-Bon told Armor that certain products were back-ordered and unavailable while at the same time, other distributors were receiving regular delivery of

these "back-ordered" products.  Armor alleges that this behavior constitutes a deceptive and fraudulent business practice, but cites no statute or case law in support of its claim.

Under New Hampshire law, the tort of unfair competition requires proof that the defendant did something to "deceive[ ] . . . the general buying public."  Optical Alignment Sys. and Inspection Serv. Inc. v. Alignment Serv. of North America, 909 F. Supp 58 (D.N.H. 1995) (quoting Salomon S.A. v. Alpina Sports Co., 737 F. Supp. 720, 722-23 (D.N.H. 1990)).  Causes of action under this tort are limited to claims where the ultimate consumer of a product is misled.  See Pacamor Bearings, Inc. v. Menebea Co., 918 F. Supp. 491 (D.N.H. 1996).  Armor has not alleged any instances of consumer confusion, and thus, fails to state a cause of action for common law unfair competition.

Cor-Bon argues that the New Hampshire Consumer Protection Act ("the Act"), RSA 358-A et seq., is likewise inapplicable to Armor's unfair competition claims.  I agree.  While the Act is to be broadly construed, it is not unlimited in scope.  In order to establish a valid claim under the Act, the conduct in issue must at least be analogous to the categories of behavior barred by the Act.  See N.H. Rev. Stat. Ann. 358-A:2 ("unfair or deceptive act or practice shall include, but it not limited to" the delineated

-21-

offenses); <u>Roberts</u>, 138 N.H. at 538. Armor's allegations against Cor-Bon for misleading Armor about the status of back-ordered products are not cognizable under the Act.

**F.    Breach of Warranty Claims**

In New Hampshire, breach of warranty claims are statutory. <u>See</u> <u>Brescia v. Great Road Realty Trust</u>, 117 N.H. 154, 157 (1977)(there is no common law cause of action for breach of warranty). Claims for breach of the implied warranty of merchantability are governed by RSA 382-A:2-314, which states, in pertinent part,

    (1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .

    (2) Goods to be merchantable must be at least such as . . . (a) pass without objection in the trade under the contract description; and . . . (c) are fit for the ordinary purposes for which such goods are used; and (e) . . . are adequately contained, packaged, and labeled . . . and (f) conform to the promises or affirmations of fact made on the container or label . . . .

Cor-Bon argues that the implied warranty of merchantability requires only that the goods be merchantable, and does not require the goods to be perfect. <u>See</u> <u>Xerox Corp. v. Hawkes</u>, 124 N.H. 610, 616 (1984)("RSA 382-A:2-314 generally provides that a seller impliedly warrants that his goods are merchantable or

-22-

generally fit for the 'ordinary purposes' for which the goods are used. . . ."); 1 White and Summers, Uniform Commercial Code § 9-8 at 523 (1995)(the goods need not "fulfill [the] buyer's every expectation"). Cor-Bon further suggests that this warranty applies,

> only to the ordinary purpose for which the goods are made and are to be used without regard to any special need of the buyer for these goods. If the goods are fit for their ordinary purpose and the buyer attempts to use them for some other purpose outside of their ordinary use and cannot so use them, the buyer cannot be heard to say that there was a breach of the warranty of merchantability.

3 Bender's Uniform Commercial Code Service: Sales and Bulk Transfers, § 7.02[3] at 7-54. Accordingly, Cor-Bon argues that Armor cannot claim that high muzzle flash prevented the ammunition from functioning as ammunition and, as a result, that Armor's claim for breach of the warranties of merchantability and/or fitness must fail as a matter of law. I disagree.

Cor-Bon manufactures high-performance ammunition. Its ammunition was designed to satisfy a demand, particularly among law enforcement and other professionals, left by the inadequacies of regular ammunition. The ordinary purpose of high performance ammunition, then, is based on its special, distinctive characteristics, which include low muzzle flash and superior dependability. Armor raises a number of factually-based claims,

-23-

supported by deposition testimony, that Cor-Bon's high-performance ammunition exhibited exceptionally high muzzle flash and was occasionally defective or mislabeled.  This is a sufficient showing to establish an issue of material fact as to the applicability of the implied warranty of merchantability and/or the warranty of fitness.

Cor-Bon argues, however, that proper notice is a pre-requisite to bringing warranty claims.  See RSA 382-A:2-607(3)(a); Town of Hooksett School District v. W.R. Grace and Co., 617 F. Supp 126, 132 (D.N.H. 1984).  The purpose of this requirement is to enable the seller to cure the breach by providing adequate replacement merchandise.  See RSA 382-a:2-508; Town of Hooksett, 617 F. Supp. at 131.  Cor-Bon insists that in all instances when it was given notice by Armor, Cor-Bon provided replacement ammunition in accordance with its statutory right to cure.  Armor admits that it cannot recall an occasion when Cor-Bon failed to provide replacement ammunition after receiving notice of a complaint.

Ayoob, however, argues that mere replacement was insufficient to cure the breaches of warranty.  According to Ayoob, because of the potentially life threatening nature of the defects in Cor-Bon's ammunition, any indication that its

ammunition is defective jeopardizes the reputation and the integrity of the product in a market that expects and demands precision. According to Ayoob, defective ammunition can result in death, either from the product itself, or by placing a law enforcement officer in the position of being unable to defend himself or others in a life-threatening situation. Such potentialities, Ayoob notes, greatly affect the reputation of a product in the marketplace and leave the breaches of warranty uncured by replacement.

Under New Hampshire law, damage to a product's reputation can render a breach of warranty incurable by replacement. According to the New Hampshire Supreme Court,

> "testimony that the continuing problem undermined . . . confidence in the . . . [product] and destroyed its value . . . should not be ignored. . . . the question of whether a defect has substantially impaired the value of the . . .[product] to the plaintiffs is one of fact to be determined by a jury . . . . The jury could find that the series of defects and problems that the plaintiffs experienced with the . . . [product] reasonably destroyed their confidence in the integrity and reliability of the . . . [product].

Welch v. Fitzgerald-Hicks Dodge, Inc, 121 N.H. 358, 364 (1981). See also N.H. Rev. Stat. Ann. 382-A:2-315 (warranty of fitness);

N.H. Rev. Stat. Ann. 382-A:2-608 (damages).[5] The applicability of these warranties to Armor's case is properly a question of fact for the jury. See id. Accordingly, Cor-Bon's motion for summary judgment on this claim is denied.

## V.    CONCLUSION

All of Ayoob's claims except her breach of warranty claims derive from her contention that Cor-Bon breached the parties' oral distributorship agreement. Her contract claim assumes that Cor-Bon breached an enforceable contract to pay Armor commissions that were owed under the agreement. I cannot rule on defendants' statute of limitations defense to the contract claim because the record is not sufficiently developed with respect to claims that arose prior to September, 1993. I also have denied the motion to the extent that it seeks to bar claims that accrued after January 1, 1996, as a genuine factual dispute exists as to whether the distributorship agreement is a contract for an indefinite term or a contract that was intended to exist in perpetuity. Although

---

[5] Proving damages under this theory may be difficult, however. By statute, damages for breach of the warranty of merchantability are measured by the difference in value between the goods delivered and the value of conforming goods. Damages under the warranty of fitness might include return of any unsold product for a refund, and potentially, lost profits deriving therefrom.

-26-

New Hampshire law ordinarily bars quasi-contract claims in a case like this where the parties' obligations are governed by a contract, I have denied defendants' motion for summary judgment with respect to Ayoob's quasi-contract claims to permit Ayoob to assert them in the event that her contract claim is later determined to be barred by the statute of frauds. Plaintiff's interference with contract claim is merely a restatement of her contract claim. Accordingly, I have granted the motion for summary judgment with respect to this claim. I also have granted the motion for summary judgment with respect to plaintiff's remaining tort claims. Finally, I have denied the motion for summary judgment with respect to the plaintiff's breach of warranty claims.

    SO ORDERED.


                                _____

                                Paul Barbadoro
                                Chief Judge

February 4, 1999

cc:  Robert Johnson, II, Esq.
     James Bassett, Esq.
     Mark J. Connot, Esq.