CRANSTON PRINT WORKS
COMPANY

v.

Paul POTHIER et al.

No. 2001–470–Appeal.

Supreme Court of Rhode Island.

April 14, 2004.

Mark Freel, Providence, for Plaintiff.

Stephen White, Warwick, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

FLANDERS, Justice.

Covenants not to compete failed to paper over this dispute. The plaintiff, Cranston Print Works Company (Cranston Print), a manufacturer of chemical products used in various paper-making and coating industries, had a falling out with one of its former vice presidents, the defendant, Koyu Nikoloff and his wholly owned corporation, the defendant International Brokerage & Consulting, Inc.[1] (Consulting) (collectively referred to herein as defendants or Nikoloff). Their disagreement centered on the interpretation and enforceability of certain noncompete clauses set forth in a written contract that they entered into when they settled a previous lawsuit that Cranston Print had filed against Nikoloff.

In this case, defendants appeal from a Superior Court judgment permanently enjoining them from consulting with or working for their co-defendant, Bolger & O'Hearn, Inc. (Bolger). Because we conclude that the hearing justice was clearly wrong in his interpretation of the covenants not to compete contained in the settlement agreement, we reverse, vacate the Superior Court judgment and order issuing injunctive and declaratory relief, and remand this case for further proceedings consistent with this opinion.

### Facts and Travel

Cranston Print employed Nikoloff in various capacities from 1972 until 1996. His duties included developing specialty chemical additives for Cranston Print's

---

1. Consulting is a corporation in which Niko-          loff is the president and sole shareholder.

Bercen unit. Before he left Cranston Print in 1996, the company had promoted Nikoloff to vice president of technical services and product development. After leaving Cranston Print, Nikoloff soon entered into a joint venture with A.P. Nonweiler & Co., Inc. (Nonweiler), a Wisconsin chemical manufacturer, to work on developing technology for coated-paper products.

Upon discovering this affiliation, Cranston Print sued Nikoloff, alleging that he had misappropriated its trade secrets through his venture with Nonweiler. On November 29, 1999, the parties resolved this litigation by executing a settlement agreement and a mutual release. In paragraph 1 of the settlement agreement, Nikoloff agreed that he would not "develop, formulate, manufacture, toll [sic], market[,] or sell any coating additive chemicals in the paper industry that are in any way competitive to the product lines or products with which Nikoloff was associated or involved during his employment with [Cranston Print] and/or Bercen." Paragraph 1 of the agreement then listed certain products and product lines that fell within this general prohibition. That same paragraph also contained a noncompete provision precluding Nikoloff "from having any financial interest in, assisting in, consulting with, or being employed by, any chemical supplier working with, or providing products or services in connection with, any of these prohibited areas or product lines." These limitations on Nikoloff's future business activities applied regardless of whether he acted "alone or in concert with others."

Paragraph 3 of the settlement agreement, however, stated that

"[n]otwithstanding the * * * provisions of [p]aragraph[] 1 * * * nothing contained in this [a]greement shall prohibit or bar Nikoloff * * * from being involved in the marketing, development, formulation, manufacture[,] or sale of certain other products or product lines with which he was not significantly involved during his employment at [Cranston Print or Bercen], or with which [Cranston Print or Bercen] did not achieve significant commercial success." (Emphasis added.)

Like paragraph 1, paragraph 3 then listed certain illustrative products that Nikoloff could be "involved in" under the agreement. In addition, paragraph 3 allowed Nikoloff to work for and perform consulting work with paper companies in areas such as paper-grade development, paper specifications and performance, and sourcing of materials and chemicals for companies, but it expressly precluded him from consulting on "the manufacturing of paper coatings or paper chemicals."

Less than six weeks after entering into this settlement agreement, Nikoloff began consulting with Bolger, another chemical supplier and a competitor of Cranston Print with respect to certain products and services used in various paper industries. Before December 1999, Bolger manufactured and supplied chemicals for use in the textile industry, but it never had manufactured or sold any chemical additives for use in any paper industries. Nevertheless, in December 1999, Bolger created a new "paper division" to develop paper-industry products, including certain additives designed to enhance paper qualities as a result of the coating process. Shortly thereafter, Nikoloff began providing consulting services to Bolger. The parties disagree about whether Nikoloff's work for Bolger involved any of the activities, product lines, or areas that paragraph 3 of the settlement allowed him to engage in, but they agree that Bolger itself provided various products or services in connection with product lines and areas that paragraph 1

of the agreement established as "off limits" to Nikoloff.

In July 2000, Cranston Print sued Bolger and one of its employees, defendant Paul Pothier, alleging misappropriation of its trade secrets, unfair competition, breach of contract, and tortious interference with contract. Cranston Print later amended its complaint to add Nikoloff and Consulting as defendants, alleging that they, too, had breached the settlement agreement by misappropriating trade secrets and by engaging in unfair competition with Cranston Print. The amended complaint sought, *inter alia,* a preliminary and permanent injunction enjoining Nikoloff from disclosing any confidential information that he obtained from Cranston Print and from further misappropriating any of its trade secrets.

After conducting a hearing on Cranston Print's motion for temporary injunctive and declaratory relief, a Superior Court hearing justice issued a bench decision enforcing the noncompetition provisions in paragraph 1 and precluding Nikoloff and his company from further working for or consulting with Bolger. The hearing justice found that the plain meaning of paragraph 1 prohibited Nikoloff from consulting with any chemical-supply company, such as Bolger, that provided products or services in connection with the types of so-called prohibited paper-coating products listed in paragraph 1. The hearing justice rejected Nikoloff's argument that paragraph 3 permitted him to work for any chemical-supply company, including Bolger, provided that he was "involved in * * * other products or product lines with which he was not significantly involved during his employment at [Cranston Print], or with which [Cranston Print] did not achieve significant commercial success," and provided further that he personally did not work on any of the product

areas or product lines prohibited by paragraph 1. Pointing to the language of paragraph 1 prohibiting Nikoloff from "consulting with * * * any chemical supplier working with or providing products or services in connection with, any of these prohibited areas or product lines," the hearing justice concluded that Nikoloff's interpretation of paragraph 3 would eviscerate the noncompete provisions contained in paragraph 1.

The hearing justice also found that the various noncompetition covenants in paragraph 1 were enforceable as written. He noted that these covenants not to compete were unusual because they were part of a settlement agreement, rather than an employment contract, a contract for the sale of a business, or a partnership agreement. Nevertheless, the hearing justice upheld the enforceability of these provisions, concluding that the circumstances leading to this settlement agreement showed that the noncompetition clauses were reasonable and equitable.

After the hearing justice's bench decision and the entry of an order granting injunctive and declaratory relief, defendants appealed to this Court. After a remand, the Superior Court entered a judgment, pursuant to Rule 54(b) of the Superior Court Rules of Civil Procedure, granting permanent injunctive relief on the same terms as the bench decision and the previous order granting temporary injunctive and declaratory relief.

On November 1, 2001, having obtained the declaratory and injunctive relief it sought against defendants, Cranston Print then entered into a separate settlement agreement with the other remaining defendants, Bolger and Paul Pothier. Under the terms of this agreement, Bolger and Pothier expressly agreed not to rehire or to accept any further services directly or indirectly from defendants.

## I

### Mootness

■ At the outset, Cranston Print argues that its separate settlement agreement with Bolger and Pothier moots this appeal. It contends that neither Nikoloff nor Consulting have challenged its separate settlement agreement with these other parties, one that prevents them from accepting any services from Nikoloff even if he was free to provide them. Thus, according to Cranston Print, any decision we might render in favor of Nikoloff would not invalidate the separate underlying settlement agreement that Cranston Print reached with the other parties to Nikoloff's new consulting arrangements.

■ "[A] case is moot if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant of a continuing stake in the controversy." *Associated Builders & Contractors of Rhode Island, Inc. v. City of Providence*, 754 A.2d 89, 90 (R.I. 2000) (per curiam). In this case, however, we reject Cranston Print's contention that its separate settlement agreement with Bolger moots this case because the effect of the court's injunction and declaratory judgment against Nikoloff extends beyond his consulting arrangements with Bolger. Indeed, the original order and the judgment declare that paragraph 1 of the settlement agreement is "reasonable and enforceable." Thus, by declaring paragraph 1 of the settlement agreement to be enforceable—without reference to how paragraph 3 of that same agreement narrows or supersedes its scope—the hearing justice effectively declared that Nikoloff was barred from working with or for any chemical supplier providing prohibited products or services. Thus, even if Nikoloff no longer can work with or for Bolger, he maintains a continuing stake in the outcome of this litigation because the ef-fect of the declaratory judgment with respect to the enforceability of paragraph 1 extends beyond Bolger and affects Nikoloff's ability to consult for other potential employers and chemical companies.

The hearing justice, in his order on October 4, 2001, deemed the noncompete clause in paragraph 1 of the settlement agreement to be enforceable as written. He interpreted the clause as barring Nikoloff from working for any chemical supplier that works with or provides products or services in connection with any of the prohibited product areas or lines—even if Nikoloff's work for such a chemical supplier involved one of the permitted areas described in paragraph 3. Thus, if we affirmed the hearing justice's order, Nikoloff would face claim-and issue-preclusion arguments whenever he attempted to engage in activities permitted under paragraph 3 for any chemical supplier that was also involved with any of the prohibited products listed in paragraph 1—even if Nikoloff's consulting work for such a supplier had nothing to do with such products. In short, the ramifications and effects of this judgment on Nikoloff extend far beyond Bolger.

Based on the foregoing, we reject Cranston Print's suggestion that its separate settlement agreement with Bolger and Pothier moots this case. Even if, after this litigation ends, Nikoloff still cannot consult for Bolger because of Bolger's separate and unchallenged settlement agreement with Cranston Print, Nikoloff continues to have a stake in the enforceable scope of the noncompete provisions that are at issue in this case.

## II

### Interpretation of Paragraphs 1 and 3

■ When reviewing the work product of a Superior Court justice sitting in

equity, we will not disturb his or her decision unless the appellant demonstrates that the decision was clearly wrong. *Moseman Construction Co. v. State Department of Transportation*, 608 A.2d 34, 37 (R.I.1992) (citing *Klowan v. Howard*, 83 R.I. 155, 159, 113 A.2d 872, 874 (1955)). In this case, we hold that the hearing justice was clearly wrong when he declined to interpret paragraph 3 of the settlement agreement as limiting, restricting, and, in some situations, superseding the scope of the covenants not to compete that are set forth in paragraph 1 of that agreement.

The hearing justice interpreted paragraphs 1 and 3 as preventing Nikoloff from working for Bolger, a chemical supplier—regardless of whether Nikoloff's personal work for Bolger involved any of the prohibited product areas and lines described in paragraph 1. To reach this conclusion, the hearing justice relied solely on the language in paragraph 1, prohibiting Nikoloff "from having any financial interest in, assisting in, consulting with, or being employed by, any chemical supplier working with, or providing products or services, in connection with, any of these prohibited areas or product lines." Given this interpretation of the agreement, the hearing justice had no reason or need to reach the factual questions of whether Nikoloff's consulting work for Bolger actually fell within any of the permitted activities described in paragraph 3, and, if not, whether his work for Bolger actually involved any of the prohibited product lines or areas described in paragraph 1.

We disagree with this interpretation of the agreement because it failed to give effect to the introductory language of paragraph 3, which states: "Notwithstanding the * * * provisions of [p]aragraph[ ] 1 * * * nothing contained in this [a]greement," shall prevent Nikoloff from engaging in certain permitted activities as pro-

vided for in paragraph 3. By using the phrases "[n]otwithstanding the * * * provisions of [p]aragraph[ ] 1," and "nothing contained in this [a]greement," the parties evinced a clear intent that the permitted activities described in paragraph 3 would limit, if not altogether trump, the breadth of the prohibitions described in paragraph 1. *See* Black's Law Dictionary 1091 (7th ed. 1999) (defining "notwithstanding" as "[d]espite" or "in spite of"). Hence, although paragraph 1 bars Nikoloff from working for any "chemical supplier" involved with any of the prohibited product lines, these prohibitions are subject to and restricted by the permitted activities and products that Nikoloff can become "involved in," as described in paragraph 3.

Thus, we interpret paragraphs 1 and 3 of the settlement agreement as allowing Nikoloff to work for a "chemical supplier," such as Bolger, so long as his work for such a supplier involves only one or more permitted products or activities as described in paragraph 3. This construction of the settlement agreement gives effect to the "[n]otwithstanding" language of paragraph 3, yet it still prevents Nikoloff from personally working with any of the prohibited product lines or areas listed in paragraph 1. And it also bars him from working for any chemical supplier that is involved with any such prohibited product—unless Nikoloff's work for such a supplier falls within any of the permitted areas or activities described in paragraph 3.

■ Under our interpretation of the noncompete clauses in the settlement agreement, Nikoloff's consulting work for Bolger may not have conflicted with the settlement agreement *per se* because his work may have involved one or more of paragraph 3's permitted product lines or activities, rather than the prohibited products and areas described in paragraph 1.

Therefore, we hold that the hearing justice improperly issued the injunction based solely on Bolger's status as a chemical supplier involved with one or more of the prohibited product lines or services. Instead, the hearing justice should receive evidence and make factual determinations about whether Nikoloff's specific work for Bolger allowed him to drop anchor inside one or more of the safe harbors mapped out in paragraph 3. If, as Nikoloff maintains, his work for Bolger was limited to the permitted areas limned in paragraph 3, then Nikoloff did not violate the terms of the settlement agreement because the introductory language in paragraph 3 ("[n]otwithstanding the * * * provisions of [p]aragraph[ ] 1") trumps everything to the contrary in paragraph 1. But if Nikoloff's work, as Cranston Print argues, involved prohibited product lines or areas, then he violated the noncompete covenants contained in paragraph 1 because nothing in paragraph 3 appears to be inconsistent with this proscription. Also, according to the settlement agreement, Nikoloff is not allowed to work for any chemical supplier, including Bolger, that is involved with any prohibited product lines or areas described in paragraph 1, unless his work for that supplier falls under one of the permitted areas of work described in paragraph 3.

Consequently, we remand this case to the Superior Court to determine (1) whether Nikoloff's consulting work for Bolger involved one or more of the permitted areas described in paragraph 3, or, if not, one or more of the prohibited product lines or areas set forth in paragraph 1, and (2) the overall reasonableness of these particular competitive restrictions on Nikoloff's future business activities (see part III below). If Nikoloff's work for Bolger was limited to paragraph 3 activities, then an appropriate judgment should enter in his favor. But if his work included any paragraph 1 activities with respect to prohibited product areas or lines, then the court should pass on the reasonableness of these restrictions pursuant to the analysis set forth in Part III of this opinion and, if they pass muster, it should, at a minimum, declare him to have breached the settlement agreement and enjoin him from engaging in such activities.

## III

### Enforceability of the Covenants Not to Compete

■ In light of our remand to the Superior Court for further fact-finding, we need not expressly rule at this time on the overall enforceability of the covenants not to compete that are set forth in the settlement agreement. Nevertheless, we will briefly address some of the issues that the parties have raised pertaining to the enforceability of these noncompete clauses. It is well settled that covenants not to compete are disfavored and subject to strict judicial scrutiny. *Durapin, Inc. v. American Products, Inc.,* 559 A.2d 1051, 1053 (R.I.1989). As a result, Rhode Island courts will uphold and enforce such provisions if, *inter alia,* the party seeking to enforce the noncompetition clause (the promisee) shows that the provision is ancillary to an otherwise valid transaction or relationship, and that "the contract is reasonable and does not extend beyond what is apparently necessary for the protection of those in whose favor it runs." *Id. See* Restatement (Second) *Contracts* § 188 (1981).[2]

---

**2.** Section 188 of the Restatement (Second) *Contracts* at 41 (1981), entitled "Ancillary Restraints On Competition," provides:

"(1) A promise to refrain from competition that imposes a restraint that is ancillary to an otherwise valid transaction or relationship is unreasonably in restraint of trade if

Initially, we note that these particular noncompete covenants are somewhat unusual because they are included in a settlement agreement arising from a post-employment dispute, as opposed to an employment contract or to a contract for the sale of a business. Despite this circumstance, we hold that the noncompetition provisions are ancillary to an otherwise valid contract because they are subordinate to a settlement agreement and to a mutual release resolving contested litigation between Cranston Print, a former employer, and Nikoloff, a former employee. That litigation and its settlement addressed material issues besides the noncompete covenants that are at issue here. Although such noncompete covenants are more often present in contracts for employment, for the sale of a business, and for partnerships and joint ventures, courts in other jurisdictions have labeled such noncompetition covenants in settlement agreements as ancillary to the settlement agreement itself. *See Herndon v. Eli Witt Co.*, 420 So.2d 920, 923 (Fla.Dist.Ct.App. 1982) (The instant covenant not to compete was ancillary to a valid settlement agreement * * *.); *Justin Belt Co., v. Yost*, 502 S.W.2d 681, 684 (Tex.1973) (commenting that noncompetition covenant in settlement agreement was not only ancillary to a permissible transaction, but was ancillary to an agreement highly favored by the courts); *Lehrer v. State Department of Social and Health Services*, 101 Wash. App. 509, 5 P.3d 722, 725 (2000) (upholding noncompetition provision under settlement

and release agreement). We concur with this approach.

Nevertheless, we are concerned that these particular noncompete clauses lack both a temporal and a geographic limitation. Although such broad restraints are not unenforceable *per se*, courts should uphold them only to the extent they are necessary to protect the promisee's legitimate interests. *See Oakdale Manufacturing Co. v. Garst*, 18 R.I. 484, 489, 28 A. 973, 974 (1894) ("[C]ontracts in restraint of trade are not necessarily void by reason of universality of time * * * nor of space * * * but they depend upon the reasonableness of the restrictions under the conditions of each case."). Thus, the lack of a geographic limit on these covenants may be enforceable if, on remand, Cranston Print shows that its business is international in character and that such an unlimited geographic restraint on Nikoloff's future business activities is reasonable in light of Cranston Print's worldwide competitive activities. On the other hand, it is possible that such an unlimited geographic restriction is overbroad and should be tailored by the court to a narrower fit if the true scope of Cranston Print's legitimate commercial interests warrants such a resizing.

Also, the lack of a temporal limitation to the noncompete provisions may be unreasonable because the duration of the prohibition is longer than necessary to protect Cranston Print's legitimate commercial interests in safeguarding its confidential business information and trade secrets.

(a) the restraint is greater than is needed to protect the promisee's legitimate interest, or
(b) the promisee's need is outweighed by the hardship to the promisor and the likely injury to the public.
"(2) Promises imposing restraints that are ancillary to a valid transaction or relationship include the following:

(a) a promise by the seller of a business not to compete with the buyer in such a way as to injure the value of the business sold;
(b) a promise by an employee or other agent not to compete with his employer or other principal;
(c) a promise by a partner not to compete with the partnership."

The practical value of such information and trade secrets as they existed on the date of Nikoloff's departure from Cranston Print may diminish over time to a vanishing point. But we leave these issues for the hearing justice to decide on remand, with Cranston Print bearing the burden to show the reasonableness of these unrestricted noncompete provisions and the court having a free hand to take a "blue pencil," if necessary, to draw in any reasonable limitations on such covenants that it concludes are overbroad.

### Conclusion

For these reasons, we reverse the decision of the hearing justice, vacate the order and judgment granting declaratory and injunctive relief in favor of Cranston Print, and remand this case for further proceedings consistent with this opinion so that the Superior Court can determine, among other things, the exact nature of the work Nikoloff performed for Bolger, whether Nikoloff's work fell within any of the paragraph 3 categories of permissible activities, and the reasonableness of the unlimited geographic and temporal scope of these covenants not to compete. After deciding whatever issues may be necessary to adjudicate the defendants' liability for the claims in question, and what remedies, if any, are appropriate for any proven violations of the settlement agreement, the Superior Court shall enter a new judgment on the merits.