# United States Court of Appeals
## For the First Circuit

No. 19-1638

CVS PHARMACY, INC.,

Plaintiff, Appellee,

v.

JOHN LAVIN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., U.S. District Judge]

Before

Lynch, Selya, and Lipez,
Circuit Judges.

John J. Cotter, with whom Jennifer J. Nagle and K&L Gates LLP were on brief, for appellant.
Michael L. Rosen, with whom Richard G. Baldwin, Allison L. Anderson, and Foley Hoag LLP were on brief, for appellee.

February 28, 2020

**LIPEZ**, **Circuit Judge**.  After working for nearly three decades at plaintiff-appellee CVS Pharmacy, Inc., defendant-appellant John Lavin accepted a new position at PillPack LLC, a direct competitor of CVS.  But Lavin never actually started that job.  After obtaining information about Lavin's new role, CVS sued Lavin, seeking to enforce a covenant not to compete (the "covenant" or the "Agreement") included in a Restrictive Covenant Agreement ("RCA") that Lavin signed in 2017.  Finding that Lavin's new position would violate the covenant and concluding that the covenant was reasonable, the district court entered a preliminary injunction enjoining Lavin from working at PillPack for eighteen months, the duration specified in the covenant.  In this interlocutory appeal, Lavin argues that the covenant is not reasonable and that the preliminary injunction, therefore, should not have been granted.  Although our reasoning differs somewhat from that of the district court, we affirm the entry of a preliminary injunction enforcing the covenant not to compete.

A.    Factual Background[1]

1.    CVS Caremark's Business

CVS operates CVS Caremark, one of the country's largest pharmacy benefit managers ("PBMs").  PBMs sell prescription-management services to entities providing prescription-drug coverage to their members.  These entities -- known as payers -- include employers, insurance companies, and unions.  PBMs negotiate on behalf of payers with pharmacies to secure reimbursement rates for prescription drugs.  They also establish pharmacy networks for payers, premised on each payer's individual needs and preferences; furnish an array of administrative services (such as claims adjudication and eligibility determinations); and procure bulk discounts and rebates directly from pharmaceutical manufacturers.  For its part, CVS Caremark offers its own mail-order pharmacy services to certain payers as clients.

CVS operates other healthcare-related subsidiaries in addition to CVS Caremark, including a sprawling chain of retail pharmacies.  CVS has erected a firewall between CVS Caremark and its retail pharmacy subsidiary.  This firewall not only prevents

---

[1] "[W]e credit the undisputed facts presented below and adopt the district court's findings as to controverted matters to the extent they are supported by the record and not clearly erroneous." United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1083 (1st Cir. 1992).

CVS Caremark's employees from accessing the prices that CVS's retail pharmacies negotiate with other PBMs but also prevents employees of CVS's retail pharmacies from accessing the prices that CVS Caremark negotiates with other retail pharmacies.

### 2. Lavin's Employment at CVS

After his almost three decades at CVS Caremark and its predecessor, Lavin became Senior Vice President for Provider Network Services in 2010. In this role, he oversaw a team of approximately 250 people and was responsible for negotiating pricing contracts with retail pharmacies, auditing pharmacies, and setting up pharmacy networks for payers. He also participated in regular underwriting calls for the contracts that CVS Caremark negotiated with its payer clients. In light of these duties, he became intimately familiar with the prices and terms of CVS Caremark's deals with both retail pharmacies and payers.

Lavin was also involved in certain strategic initiatives undertaken by CVS Caremark. For instance, he assisted with the company's strategy for contracting with mail-in retail pharmacies ("MIRs"), which fill prescriptions by mail. This project included developing strategies about how best to differentiate CVS Caremark's mail-based services from those offered by MIRs. He helped formulate CVS Caremark's strategy for the upcoming contracting cycle and create novel pharmacy reimbursement and pricing models. Each year, he attended several executive committee

meetings that covered an array of topics ranging from revenue and pricing to major client accounts and regulatory impacts.

    **3.    Noncompetition Agreement**

At four points during his tenure as a senior vice president at CVS Caremark -- in 2011, 2012, 2014, and 2017 -- CVS required Lavin to sign an RCA. Each RCA contained noncompetition, nonsolicitation, and nondisclosure covenants. Each time Lavin signed an RCA, he was awarded CVS stock.

The 2017 RCA, executed in exchange for a stock award worth $157,500, is the centerpiece of this appeal. The covenant not to compete contained therein bars Lavin, for eighteen months after the termination of his employment, from "directly or indirectly . . . engag[ing] in Competition" anywhere in the United States that CVS operates. The covenant in the 2017 RCA defines "Competition" as:

> [P]roviding services to a Competitor of the Corporation [CVS] . . . that: (i) are the same or similar in function or purpose to the services I [Lavin] provided to the Corporation at any time during the last two years of my employment by the Corporation; or (ii) will likely result in the disclosure of Confidential Information to a Competitor or the use of Confidential Information on behalf of a Competitor.

"Competitor" is defined, in turn, as:

> [A]ny person, corporation or other entity that competes with one or more of the business offerings of the Corporation[.] . . . [T]he Corporation's business offerings include:

(i) pharmacy benefits management ("PBM") . . .; (ii) retail, which includes the sale of prescription drugs, over-the-counter medications, [and other products and services sold by CVS's retail pharmacies] ("Retail"); (iii) retail health clinics ("MinuteClinic"); (iv) the provision of [various products and services] to long-term care facilities, other healthcare service providers and recipients of services from such facilities ("Long-Term Care"); (v) the provision of prescription infusion drugs and related services ("Infusion"); and (vi) any other business in which [the] Corporation is engaged or imminently will be engaged.

. . . .

The Parties acknowledge that . . . an entity will be considered a Competitor if it provides products or services competitive with the products and services provided by the Corporation within the last two years of my employment.

I agree to this enterprise-wide definition of non-competition which may prevent me from providing services to any of the Corporation's PBM, Retail, MinuteClinic, Long-Term Care and Infusion Competitors or any combination thereof . . . .

This definition of "Competition" and the eighteen-month noncompetition period appear in all four of the RCAs that Lavin signed. However, the definition of "Competitor" expanded over time. The 2011 and 2012 RCAs limited "Competitors" to other companies providing PBM services. The 2014 RCA expanded this definition to include retail pharmacies and health clinics, as well as any other entity that "provides products or services competitive with the products and services provided by the

Corporation within the last two years" of Lavin's employment.  By 2017, as stated above, the definition of "Competitor" included companies providing services to long-term care facilities and prescription infusion drugs.

### 4.    Lavin's New Job at PillPack

In November of 2018, Lavin began discussions with PillPack about possible employment.  PillPack is an online retail pharmacy founded in 2013 and wholly owned by Amazon.com, Inc. PillPack aspires to create a new model of providing prescription drugs to patients.  Previously, Lavin led CVS Caremark's development of a strategy for determining whether and under what terms to contract with PillPack, which is now enrolled in CVS Caremark's pharmacy network.  Neither PillPack nor Amazon.com operates a traditional PBM business.

Lavin accepted employment at PillPack on March 29, 2019 and gave CVS his two-week notice on April 8, 2019.  In his new position, he will be responsible for negotiating with PBMs and payers.[2]  Moreover, PillPack's chief executive officer ("CEO") stated that he expects Lavin to "contribute significantly to

---

[2] During some stages of the litigation, Lavin asserted that his new job will require him to negotiate only with PBMs.  The district court found this assertion too modest and determined that Lavin's responsibilities also will include negotiating with payers.  See CVS Pharmacy, Inc. v. Lavin, 384 F. Supp. 3d 227, 230, 234 (D.R.I. 2019).  Lavin does not challenge this factual finding on appeal.

[PillPack's] procurement efforts . . . and help [PillPack] develop a long term disruptive strategy." CVS Pharmacy, Inc. v. Lavin, 384 F. Supp. 3d 227, 230 (D.R.I. 2019) (alteration in original). Lavin and PillPack have agreed that he will be recused, at least for some period of time, from any discussions or work involving CVS Caremark or its clients. Those projects will be the responsibility of PillPack's CEO, to whom Lavin will report.

## B. Procedural History

After requesting information about Lavin's new employment, CVS filed a diversity suit against Lavin in the United States District Court for the District of Rhode Island, seeking to enforce the covenant not to compete contained in the 2017 RCA. The district court entered a temporary restraining order barring Lavin from either working for or disclosing confidential information to PillPack. After limited discovery, conducted on an expedited basis, CVS moved for a preliminary injunction.

On June 18, 2019, the district court granted CVS's motion. See id. at 238. The court concluded that Lavin's proposed work for PillPack would violate the terms of the covenant not to compete. See id. at 233-36. Moreover, the court found the covenant reasonable and, therefore, enforceable under Rhode Island law. See id. at 236-37. Lavin filed this interlocutory appeal challenging the entry of the preliminary injunction.

When assessing whether to grant a preliminary injunction, a trial court must consider four factors: "the movant's likelihood of success on the merits"; "whether and to what extent the movant will suffer irreparable harm" in the absence of injunctive relief; "the balance of [relative] hardships," that is, the hardship to the nonmovant if enjoined as opposed to the hardship to the movant if no injunction issues; and "the effect, if any, that an injunction [or the lack of one] may have on the public interest." See Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013).[3] In his interlocutory appeal, Lavin has made no arguments concerning the second, third, and fourth factors, which the district court concluded supported the entry of a preliminary injunction. See CVS Pharmacy, 384 F. Supp. 3d at 237-38. Thus, we focus only on the first: CVS's likelihood of success on the merits. This factor weighs most heavily in the preliminary injunction analysis. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996).

When reviewing a district court's entry of a preliminary injunction, we examine legal questions de novo, findings of fact for clear error, and the balancing of the four factors for abuse

---

[3] Because "the parties have not suggested that state law supplies meaningfully different criteria," we will use the federal preliminary injunction standard in this diversity case. See Lanier Prof'l Servs., Inc. v. Ricci, 192 F.3d 1, 3 (1st Cir. 1999).

of discretion.  See Corp. Techs., 731 F.3d at 10.  Although review for abuse of discretion demands a degree of deference to the district court, we have found district courts to have abused their discretion by making "a material error of law," see id., "ignor[ing] pertinent elements deserving significant weight, consider[ing] improper criteria, or, though assessing all appropriate and no inappropriate factors, plainly err[ing] in balancing them," Ross-Simons, 102 F.3d at 16.

**III.**

**A.   Enforceability of Covenants Not to Compete**

Under Rhode Island law,[4] a party seeking to enforce a covenant not to compete must first establish three threshold requirements: (1) the covenant "is ancillary to an otherwise valid transaction or relationship, such as an employment contract"; (2) the covenant "is supported by adequate consideration"; and (3) the covenant is designed to protect a "legitimate interest" of the employer.  Durapin, Inc. v. Am. Prods., Inc., 559 A.2d 1051, 1053 (R.I. 1989).  The district court concluded that these threshold

---

[4] To evaluate the likelihood of success on the merits in a diversity case, we look to state law for the substantive rules of decision.  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938); Crellin Techs., Inc. v. Equipmentlease Corp., 18 F.3d 1, 4 (1st Cir. 1994).  When the parties have agreed about what law applies, a federal court sitting in diversity need not engage in an independent choice-of-law analysis.  See Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991).  Thus, we will apply Rhode Island law, per the parties' agreement in the 2017 RCA and in the district court.

requirements were met, including that the covenant was designed to protect CVS's legitimate interest in securing its confidential information. CVS Pharmacy, 384 F. Supp. 3d at 236-37. Lavin does not challenge this determination on appeal.

Rather, Lavin focuses his argument on the reasonableness of the 2017 covenant. In Rhode Island, "covenants not to compete are disfavored and subject to strict judicial scrutiny." Cranston Print Works Co. v. Pothier, 848 A.2d 213, 219 (R.I. 2004). Accordingly, such covenants "will be enforced as written only if the contract is reasonable and does not extend beyond what is apparently necessary for the protection of those in whose favor it runs." Durapin, 559 A.2d at 1053. The reasonableness of a covenant depends on factors such as whether it is narrowly tailored; whether its scope is reasonably limited in activity, geography, and time; whether the hardship to the employee outweighs the employer's need for protection; and whether enforcement of the covenant is likely to harm the public interest. See R.J. Carbone Co. v. Regan, 582 F. Supp. 2d 220, 225 (D.R.I. 2008). Whether a covenant is reasonable is a question of law. Durapin, 559 A.2d at 1053. If a covenant is unreasonable, a court may nevertheless modify and enforce the covenant, under Rhode Island's partial enforcement doctrine, to the extent reasonably necessary to protect the employer's legitimate interests, so long as there is

- 11 -

"no evidence of bad faith or deliberate overreaching on the part of the promisee." Id. at 1058.

Lavin insists that the covenant here is unreasonable and therefore not enforceable because its definition of "Competition," which incorporates its expansive definition of "Competitor," is overly broad. While Lavin does not contest that his new position at PillPack falls within the scope of the covenant's prohibited activities, or that PillPack qualifies as a Competitor under the terms of the Agreement, he contends that, because the covenant sweeps more broadly than necessary to protect CVS's confidential information, the covenant as a whole is unreasonable and, hence, unenforceable. In other words, Lavin asserts that the reasonableness of the covenant must be assessed facially.

CVS urges a different view of the reasonableness inquiry. While CVS does appear at points in its brief to defend the covenant as facially reasonable, it ultimately urges us to analyze reasonableness in light of the district court's factual findings about the ways in which Lavin might violate the covenant. CVS contends that, because Rhode Island law requires courts to consider the particular facts of a case, courts cannot consider the language of restrictive covenants in a vacuum or rely on hypothetical employment constraints to assess whether a particular covenant imposes a reasonable restriction. Instead, the court should take an "as-applied" approach to assessing reasonableness:

the court should consider only whether its enforcement in a particular instance -- here, to prevent Lavin from starting his job at PillPack -- is reasonable.  Even if the covenant may sweep more broadly than necessary to protect CVS's legitimate interests, that is an issue for another day under CVS's view of the law.  As it turns out, both parties' interpretations of Rhode Island law draw support from the applicable precedent and secondary sources embraced by the Rhode Island Supreme Court.

**B.    Two Views of Reasonableness under Rhode Island Law**

The Rhode Island Supreme Court has made clear that the reasonableness of a covenant is fact-specific: "[w]hen considering the validity of a noncompetition agreement, the crucial issue is reasonableness, and that test is dependent upon the particular circumstances surrounding the agreement."  Durapin, 559 A.2d at 1053 (citing Max Garelick, Inc. v. Leonardo, 250 A.2d 354, 356-57 (R.I. 1969)).  The Second Restatement of Contracts, which the Rhode Island Supreme Court has adopted, see Cranston Print Works, 848 A.2d at 219; see also Nestle Food Co. v. Miller, 836 F. Supp. 69, 73-74 (D.R.I. 1993), also affirms that "[w]hat limits as to activity, geographical area, and time [in a restrictive covenant] are appropriate in a particular case depends on all the circumstances," Restatement (Second) of Contracts § 188, cmt. d (Am. Law Inst. 1981).

However, it is not clear whether an assessment of "the particular circumstances" means that Rhode Island law calls for a facial review of a covenant, as Lavin contends, or as applied, as CVS argues. On the one hand, Rhode Island's policy concerns about restrictive covenants weigh against a case-specific approach. See, e.g., Cranston Print Works, 848 A.2d at 219 (stating that covenants not to compete are "disfavored" and subject to "strict judicial scrutiny"); see also 6 Williston on Contracts § 13:4 (4th ed. 2019) (describing concerns that restrictive covenants can be "oppressive" and injurious to the public interest). As Lavin points out, covenants preventing free job movement diminish competition and can influence employees' decisions even before an employer seeks to enforce a covenant in court. This general skepticism suggests that courts should engage in facial review of covenants. Such review would incentivize the drafting of narrow noncompetition agreements and combat the negative impact of sweeping covenants.

Facial review is also consistent with the Rhode Island Supreme Court's repeated formulation of the reasonableness inquiry as focused on the agreement as a whole. See, e.g., Cranston Print Works, 848 A.2d at 219 (noting that the party seeking enforcement must show that "the contract is reasonable" (emphasis added)); Durapin, 559 A.2d at 1053 (stating that assessing the reasonableness of a covenant depends on "the particular

circumstances surrounding the agreement" (emphasis added));
Oakdale Mfg. Co. v. Garst, 28 A. 973, 974 (R.I. 1894) (stating
that "[t]he test [of reasonableness] is to be applied according to
the circumstances of the contract").

On the other hand, Rhode Island courts have, at times,
used language that emphasizes the importance of assessing
reasonableness based on the facts of a given case, echoing a
traditional as-applied test. See, e.g., Mento v. Lanni, 262 A.2d
839, 841-42 (R.I. 1970) (noting that "since we are dealing with
the concept of reasonableness, each case must be judged on its own
facts" (emphases added)). In Mento, for instance, the defendant,
Lanni, sold the plaintiff, Mento, a barber shop and, in the bill
of sale, agreed "not [to] open another barber shop under the same
name or any other name within a two-mile radius of the shop." Id.
at 839. Although Lanni continuously operated a barber shop in
Providence after the sale, it was only after five years that he
opened a shop somewhere less than two miles from the original
location, in violation of the agreement. Id. When Mento sued to
enforce the agreement, the Rhode Island Supreme Court considered,
in assessing the agreement's reasonableness, numerous facts,
including the number of customers Mento claimed he had lost after
Lanni opened his shop and that Mento had himself seen his business
grow from one to three barbers. Id. at 842. Based on these facts,
the court concluded that enforcing the agreement after this much

- 15 -

time had passed was unreasonable, even though the agreement itself included no temporal restriction.  Id. at 842-43.

The Corbin on Contracts treatise, which the Rhode Island Supreme Court has cited favorably, see Durapin, 559 A.2d at 1059, arguably supports such an as-applied approach.  After noting that courts often have difficulty determining the precise bounds of a reasonable restriction, the treatise explains that making such a determination is often unnecessary because "[t]he question before the court tends usually to be whether a restriction against what the defendant has done in fact or is threatening to do would be a reasonable and valid restriction."  15 Corbin on Contracts § 80.26 (2019).  Accordingly, "[t]he court should always permit the plaintiff to show the actual extent of the protectable interest that is involved and that the defendant has committed a breach within that extent."[5]  Id. (emphasis added).  In this case, for instance, the covenant at issue includes six kinds of Competitors, only two of which were relevant to the district court's conclusion that PillPack was a Competitor.  Under a facial review, CVS would

_____

[5]  We acknowledge, as Judge Selya points out in his concurrence, that this passage appears in a section of the treatise entitled "Partial Enforcement of Restrictive Covenants."  15 Corbin on Contracts § 80.26.  However, the language in the passage suggests that the described approach is the way that courts should always approach their analysis of a covenant's reasonableness. Whether, by doing so, courts are, in fact, conducting a partial enforcement analysis, as Judge Selya contends, we think unclear both from the treatise and the caselaw.

nevertheless need to justify the breadth of that definition, even though that broad inquiry would have little to do with the actual controversy between the parties. The as-applied approach avoids that inefficient mismatch.

Indeed, we see the potential unwieldiness of the facial approach as strong support for CVS's view of the reasonableness inquiry. By their nature, lawsuits to enforce covenants not to compete must be decided quickly and, often, as here, at the preliminary injunction stage. Engaging in a meaningful facial review of an agreement would often require extensive discovery. For this reason, as the Corbin treatise suggests, the as-applied approach may be more workable for courts.

## C. The Reasonableness of CVS's Agreement

As the discussion above reveals, we are presented with two compelling views of Rhode Island law, which reflect a tension between the state's policy concerns, addressed by the facial approach, and the practical benefits of the as-applied approach. Typically, when a federal court is confronted with an unresolved question of state law, our job is to "ascertain the rule the state court would most likely follow under the circumstances." Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir. 1996). We may look to "analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law"

- 17 -

for guidance. Id. But we must "take care not to extend state law beyond its well-marked boundaries in an area . . . that is quintessentially the province of state courts." Markham v. Fay, 74 F.3d 1347, 1356 (1st Cir. 1996).

Here, however, we need not take a position on which understanding of Rhode Island law is correct, because, under either analytical framework, as we explain, the outcome would be the same.

**1.  As-Applied Review**

Before assessing whether the Agreement was reasonable, the district court had to consider whether Lavin's new job at PillPack fell within the Agreement's prohibited activities. The district court concluded that it did. CVS Pharmacy, 384 F. Supp. 3d at 236. In making this threshold determination, the district court made numerous factual findings, including that "it is highly likely that Mr. Lavin's new employment will result in the disclosure of Confidential Information" to PillPack, "a Competitor in the industry." Id. Under Rhode Island law, "a business's confidential information . . . may qualify as a legitimate interest" that a noncompetition agreement can protect. Astro-Med, Inc. v. Nihon Kohden Am., Inc., 591 F.3d 1, 17 (1st Cir. 2009).

Lavin contends that there are narrower means to protect CVS's interest in its confidential information than preventing him from assuming the position at all. Specifically, Lavin points out that the 2017 RCA also contains nondisclosure and nonsolicitation

provisions. He argues that these provisions suffice to protect CVS's confidential information from PillPack. Thus, he contends, the Agreement as applied even to his specific position at PillPack is unreasonable because barring Lavin's employment entirely, rather than imposing other restrictions on what he can do at PillPack, is too broad a restraint.

We disagree. The district court's factual findings show that Lavin has extensive knowledge of CVS Caremark's strategic initiatives and detailed information about its contracts with retail pharmacies and payers. It strains credulity to think that a top-echelon executive like Lavin could develop a strategy for PillPack without dipping into this knowledge. Indeed, as the district court found, see CVS Pharmacy, 384 F. Supp. 3d at 230, PillPack hired Lavin in part to help develop tactics to disrupt the industry, a role that he is suited to perform chiefly because of his knowledge of strategic initiatives developed by a major industry player.

For similar reasons, PillPack's and Lavin's representations that Lavin will not participate in any work involving CVS Caremark or its clients are not sufficient to protect CVS's confidential information, such that enforcing the Agreement here would be unreasonable. As the district court found, in his new position, Lavin would report directly to PillPack's CEO, id., who, in turn, would be overseeing work related to CVS. PillPack's

CEO has indicated that the two would communicate openly about Lavin's strategy for negotiating with PBMs other than CVS, Lavin's "primary responsibility" at PillPack.  Id. at 234.  Thus, the confidential information Lavin gained from his years at CVS Caremark, which would inevitably inform his strategy in negotiating with other PBMs, would indirectly inform the CEO's similar negotiations with CVS Caremark.[6]

For these reasons, we conclude that, under an as-applied approach, enforcing the Agreement to bar Lavin from working at PillPack is reasonable.  The narrower means that Lavin has argued would protect CVS's confidential information are insufficient based on the district court's unchallenged factual findings about Lavin's role at CVS and his new position at PillPack.

## 2.   Facial Review and Partial Enforcement

In granting the preliminary injunction for CVS, the district court took the facial approach and held that, as written, the Agreement was reasonable and, thus, enforceable.  Id. at 236-

---

[6] In his reply brief, Lavin also asserts that barring him from working for PillPack would impose an undue hardship upon him and, at the same time, offend the public's interest in a competitive pharmaceutical industry, factors relevant in assessing reasonableness under Rhode Island law.  See R.J. Carbone, 582 F. Supp. 2d at 225.  Although Lavin made passing references in his opening brief to his inability to work, he did not develop this argument there, and it is therefore waived.  See Lawless v. Steward Health Care Sys., LLC, 894 F.3d 9, 25 (1st Cir. 2018) (holding that arguments advanced for the first time in an appellant's reply brief are deemed waived).

37. The court concluded that "[t]he non-competition provision in the Agreement is tailored to serve CVS's legitimate interest in protecting its Confidential Information and is reasonable in duration and scope." Id. In reaching this determination, it noted that "[t]he Agreement specifically and narrowly defines both what qualifies as 'Competition' and who qualifies as a 'Competitor' to protect its legitimate interests." Id. at 237.

We are not prepared, at this preliminary stage of the litigation, and on the record before us, to adopt the district court's conclusion that the Agreement is reasonable on its face. For example, CVS has not explained how the lengthy list of "Competitors" in the RCA meets the narrow-tailoring requirement of Rhode Island law.

However, our analysis under this facial framework does not end simply because we decline to take a position on the Agreement's facial reasonableness. As explained above, Rhode Island has adopted the doctrine of partial enforcement, which permits the enforcement of overly broad covenants to the extent reasonable, so long as there is no bad faith or deliberate overreaching by the employer. Durapin, 559 A.2d at 1058. The district court concluded that this case did not involve deliberate overreaching. CVS Pharmacy, 384 F. Supp. 3d at 237 n.9.[7]

---

[7] Lavin disputes this finding on appeal. But he has not identified any evidence that persuades us that the district court's

Therefore, even if Rhode Island does require a facial review of a covenant's terms, and even assuming CVS failed such a review here, we conclude that, pursuant to the partial enforcement doctrine, it is reasonable to enforce the Agreement to prevent Lavin from commencing his work at PillPack for the specified duration. That is, even if the Agreement is facially overbroad, an assumption that we make here for the purpose of analysis, the doctrine of partial enforcement permits us to "modify" the overly broad Agreement and enforce it to the extent reasonable. Here, we conclude that Lavin's new role at PillPack would fall within the bounds of activities prohibited by the Agreement, even assuming its scope needed to be reduced to make it reasonable.

We acknowledge that we have found no Rhode Island cases that use the partial enforcement doctrine in this way. Typically, courts interpreting Rhode Island law have used the doctrine to reduce a temporal or geographic restriction that a party is attempting to enforce but that a court concludes is unreasonable. See, e.g., Astro-Med, Inc., 591 F.3d at 14-15; R.J. Carbone Co., 582 F. Supp. 2d at 225-26. For instance, in R.J. Carbone Co., the defendant, Timothy Regan, who had worked as a salesman for Carbone,

---

finding was clearly erroneous. He simply points to earlier noncompetition agreements with fewer restrictions as evidence that CVS deliberately overreached in drafting the agreement at issue here. The bare fact of a broader agreement does not on its own prove overreaching.

a floral distributor, had signed a covenant "not to compete with Carbone for one year within 100 miles of Hartford, Connecticut." 582 F. Supp. 2d at 222.  When Regan left Carbone, he went to work for another floral distributor and sold flowers to at least two of his previous customers from Carbone.  Id. at 222-23.  Carbone sued to enforce the noncompetition agreement.  Id. at 223.  Applying Rhode Island law, the district court concluded that, although the agreement was reasonable in its restriction on the kinds of activities Regan could perform and the time period for which the restriction would apply, the geographic scope was overly broad -- the 100 mile radius unnecessarily included "potential customers to whom Regan never sold, and prior customers to whom he has not recently sold."  Id. at 226.

Accordingly, the court used the doctrine of partial enforcement to reduce the unreasonable geographic limit.  Id. at 226-27.  It issued an injunction tailored to prevent Regan from soliciting current Carbone customers with whom he had worked in his assigned sales territory, rather than with a general geographic limitation.  Id.  Stated more generally, the court refused to enforce the full scope of the agreement, as Carbone sought, and instead partially enforced it, delivering only some of the relief to Carbone that it requested by actually modifying the terms of the agreement.

The case before us does not fit this model and, thus, the applicability of the partial enforcement doctrine is less straightforward. Unlike in Carbone, we are not "modifying" or narrowing a term of the Agreement so that it can be enforced reasonably. Nor are we delivering only part of the relief CVS seeks. Rather, we are using the partial enforcement doctrine to conclude that any potentially unreasonable aspects of the Agreement do not prevent CVS from winning the full relief it seeks based on the narrowest aspects of the Agreement as written.[8] Strikingly, when used in this way, the partial enforcement doctrine mirrors an as-applied approach.[9]

---

[8] For instance, even if we were to hold that the full definition of "Competitor" is unreasonable, the partial enforcement doctrine would allow us to strike the offending aspects of the definition and retain those that are reasonable. The remainder of a modified definition would include PillPack, given its direct competition with the division of CVS in which Lavin worked.

[9] Judge Selya criticizes the as-applied approach because he thinks its similarity in this case to the partial enforcement analysis suggests that the two are mutually exclusive. In his view, this means that the as-applied approach cannot be correct because that approach would render superfluous the doctrine of partial enforcement and irrationally do away with its prerequisites -- a showing that the restrictive provision was not the result of bad faith or deliberate overreaching. Although in a much more circumscribed way, we think there could still be room for the application of the partial enforcement doctrine under the as-applied approach. For example, if the covenant at issue here precluded Lavin from engaging in Competition for ten years, rather than eighteen months, we might conclude that the lengthy temporal restriction makes the Agreement unreasonable, even using the as-applied approach. However, the partial enforcement doctrine would allow us to enforce the Agreement to prevent Lavin from taking his job but for less than the full ten years, as written in the

We are confident that using the partial enforcement doctrine in this way is consistent with the principles articulated in the Rhode Island cases that employ this doctrine -- that courts in equity should enforce agreements to the extent reasonable -- such that CVS wins, even if Lavin is correct that reasonableness must be assessed facially. Nonetheless, because we have found no cases using the doctrine as we have, we hesitate to conclude that this is the analytical framework -- rather than a straightforward as-applied approach -- that a Rhode Island court would employ if presented with a case of this kind.

We recognize that, as we have undertaken them here, these two approaches look alike in many respects. However, as we have suggested, the facial and as-applied approaches can diverge significantly. Typically, facial review would require an exhaustive inquiry into the reasonableness of all aspects of an agreement, even those not directly at issue -- an inquiry we have omitted here only by assuming unreasonableness. There is another significant distinction: the partial enforcement doctrine can be used only after a court confirms that there has been no bad faith

---

Agreement. That said, we do acknowledge that the as-applied approach would reduce the role of the partial enforcement doctrine and also permit employers to enforce covenants without first showing that a covenant is reasonable as a whole or, at a minimum, not the product of bad faith or overreaching. As we have expressed, these policy concerns, as reflected in decisions of the Rhode Island Supreme Court, are what give us pause about embracing the as-applied approach outright.

or deliberate overreaching. Although that consideration does not, as we explained, change the outcome in this case, it might in others. Thus, we leave it to the Rhode Island courts to clarify which doctrinal framework is correct when, like here, a party seeks relief based on the narrowest aspects of a broad agreement.

**IV.**

For the reasons described above, we conclude that CVS is likely to succeed on the merits of its claim for injunctive relief, whether the trial court uses the as-applied or the facial approach in evaluating the reasonableness of the restrictive covenant at issue. Because this is the only factor of the preliminary injunction framework that Lavin challenges in this interlocutory appeal, and because the district court concluded that the other factors counsel in favor of CVS, we affirm the district court's entry of a preliminary injunction.

So ordered.

**-Concurring Opinions Follow-**

**LYNCH**, **Circuit Judge, concurring**.  I join only those portions of Judge Lipez's opinion affirming the district court on the basis of what that opinion calls the "as applied" analysis.  Rhode Island law requires that result.  I do not join and do not agree with those portions of the opinion purporting to find in Rhode Island law a "facial analysis" of non-compete agreements and the opinion's unprecedented use of the partial enforcement doctrine.  If Rhode Island law is to be extended in either of those two ways, it is up to the Rhode Island courts or legislature to do so, and not the federal courts.  See Doe v. Trs. of Bos. Coll., 942 F.3d 527, 535 (1st Cir. 2019); Rared Manchester NH, LLC v. Rite Aid of N.H., Inc., 693 F.3d 48, 54 (1st Cir. 2012) ("[W]e ought not 'stretch state precedents to reach new frontiers.'" (quoting Porter v. Nutter, 913 F.2d 37, 41 (1st Cir. 1990))).

**SELYA**, **Circuit Judge (concurring in the judgment).**  I agree that the entry of a preliminary injunction enforcing the covenant not to compete should be affirmed.  In view of the district court's thorough and fully supportable findings of fact, CVS is likely to succeed in establishing that the covenant is enforceable.  Barring Lavin from assuming his role at PillPack for the contractually specified eighteen-month period is an appropriate means of protecting CVS's confidential information.  I part ways with the lead opinion, though, when it declines to choose between the two analytic frameworks that may potentially undergird this outcome.  See ante at 18, 25-26.  In particular, the lead opinion acknowledges two theoretical approaches for determining the reasonableness of a covenant.  See ante at 13-17.  Under what the lead opinion terms the "facial approach," a court must consider whether the full scope of the noncompetition bar is reasonable.  By contrast, under what the lead opinion terms the "as-applied approach," a court must ask only whether it is reasonable to bar the employee from the specific form of competition in which he plans to engage.  In my judgment, the Rhode Island Supreme Court would adopt the facial approach.  The as-applied approach is inconsistent with the Rhode Island Supreme Court's description of the reasonableness test, the concerns about oppressive restrictions that motivate much of the law in this area, and the contours of the partial enforcement doctrine.

There are at least two persuasive reasons for concluding that the Rhode Island Supreme Court would adopt the facial approach (both of which are acknowledged by the lead opinion, see ante at 14-15). First, that court has repeatedly stated that the reasonableness inquiry concerns the contract or agreement as a whole. See, e.g., Cranston Print Works Co. v. Pothier, 848 A.2d 213, 219 (R.I. 2004); Durapin, Inc. v. Am. Prods., Inc., 559 A.2d 1051, 1053 (R.I. 1989); Oakdale Mfg. Co. v. Garst, 28 A. 973, 974 (R.I. 1894). Second, the court's concerns about oppressive restraints on trade align much more neatly with the facial approach. Under Rhode Island law, "covenants not to compete are disfavored and subject to strict judicial scrutiny." Cranston Print, 848 A.2d at 219; see Durapin, 559 A.2d at 1053. This level of scrutiny protects employees from covenants that unreasonably limit their ability to seek employment or engage in trade. See Durapin, 559 A.2d at 1057-58; Max Garelick, Inc. v. Leonardo, 250 A.2d 354, 357 (R.I. 1969). Such considerations militate against conducting the reasonableness analysis in a manner that ignores the full scope of the terms of a covenant (as the as-applied approach would require us to do).

In all events, the facial approach coheres more logically with the doctrine of partial enforcement than does the as-applied approach. Under the partial enforcement doctrine, a Rhode Island court may narrow the scope of an unreasonable covenant

- 29 -

and enforce it to whatever extent is reasonably necessary to protect the employer's legitimate interests. See Durapin, 559 A.2d at 1058. This analysis stands separate and apart from the facial approach, which examines the reasonableness of a covenant according to the full scope of its terms. It is only if the court finds those terms unreasonable that the partial enforcement doctrine comes into play and permits the court to determine what restrictions on competition are reasonable under the circumstances. See id. The lead opinion's attempt to reconcile the partial enforcement doctrine with the as-applied approach is like trying to insert a square peg into a round hole.

To be sure, in a case like the one before us — in which a former employee has defected to a direct competitor — the partial enforcement doctrine and the as-applied approach reduce to exactly the same question: does the reasonable scope of the covenant encompass the employee's new position? To me, this redundancy plainly indicates that the threshold reasonableness inquiry must involve a broader question about the full scope of the covenant as written and counsels in favor of deploying the facial approach.

To cinch the matter, there is an obvious lack of synergy between the as-applied approach to reasonableness and the exceptions to partial enforcement for bad faith and deliberate overreaching recognized by the Rhode Island Supreme Court. Although a Rhode Island court may not partially enforce an

unreasonable covenant upon a finding of bad faith or deliberate overreaching on the employer's part, see id., such a finding does not render a reasonable covenant unenforceable. Seen in this light, the as-applied approach effectively shifts the partial enforcement analysis into the threshold reasonableness inquiry while simultaneously eliminating an inquiring court's ability to consider an employer's bad faith or deliberate overreaching. This shift borders on the irrational; it would severely compromise the utility of these exceptions as a means of discouraging employers from deliberately foisting unreasonable and oppressive covenants on their employees.[10] See Ferrofluidics Corp. v. Advanced Vacuum Components, Inc., 968 F.2d 1463, 1470-71 (1st Cir. 1992). I simply do not believe that the Rhode Island Supreme Court would countenance such an odd dynamic.

There is more. The harmful effects of oppressive restrictions on competition — which discourage employees from seeking other employment opportunities due to the threat of litigation, see id. at 1471 — cannot plausibly be said to depend

_____

[10] Although the Rhode Island Supreme Court has never expressed this rationale for the exceptions to partial enforcement in so many words, its formulation of the doctrine derives from the Tennessee Supreme Court's decision in Central Adjustment Bureau, Inc. v. Ingram, 678 S.W.2d 28 (Tenn. 1984). See Durapin, 559 A.2d at 1058. In Ingram, the court focused on the risk of employers imposing oppressive restrictions on their employees when explaining why it would not partially enforce a contract that "is deliberately unreasonable and oppressive." 678 S.W.2d at 37.

on how an employee may happen to violate his covenant. Under the as-applied approach, though, that happenstance determines whether a court will find the covenant reasonable and, thus, whether the employee can point to an overly broad and oppressive covenant as evidence of bad faith or deliberate overreaching. To this extent, the as-applied approach unduly restricts courts from using an employer's bad faith or deliberate overreaching as a tool to protect employees from oppressive covenants. Once again, I cannot imagine that the Rhode Island Supreme Court would welcome such a result.

With respect, I do not find convincing the lead opinion's suggestion that the as-applied approach might control here. See ante at 15-17. Although the Rhode Island Supreme Court has emphasized that the reasonableness inquiry must consider the facts and circumstances of each case, see, e.g., Durapin, 559 A.2d at 1053; Mento v. Lanni, 262 A.2d 839, 841-42 (R.I. 1970), this emphasis does not support, much less mandate, use of the as-applied approach. It merely expresses the commonsense notion that the reasonableness of the restrictions contained in a covenant — such as temporal or geographic limitations — depends not on any bright-line rules but on the relationship of the parties and their particular interests. See, e.g., Oakdale Mfg. Co., 28 A.2d at 974 ("[C]ontracts in restraint of trade are not necessarily void by reason of universality of time, nor of space; but they depend upon

the reasonableness of the restrictions under the conditions of each case." (citations omitted)). The Mento court considered facts about the parties in just this way, explaining that it was assessing the reasonableness of the covenant's "unlimited restriction as to time." 262 A.2d at 842. Contrary to the lead opinion's intimation, Mento simply does not suggest that a court can ignore the full scope of a covenant as written when determining its reasonableness.

Similarly, the lead opinion's reliance on Professor Corbin's treatise does not get it very far. The passage that the lead opinion cites appears in a section of the treatise entitled "Partial Enforcement of Restrictive Covenants" and, unsurprisingly, discusses the partial enforcement doctrine, not the threshold reasonableness inquiry. See ante at 16-17 (citing 15 Corbin on Contracts § 80.26 (2019)). The passage explains that a court deciding whether to partially enforce an unreasonable covenant need not always determine the boundaries of what would constitute a reasonable restriction. See Corbin on Contracts, supra, § 80.26. Instead, the operative question is "whether a restriction against what the [employee] has done in fact or is threatening to do would be a reasonable and valid restriction." Id. In short, what the lead opinion labels as part of the as-applied approach to the reasonableness inquiry is no such thing;

it is nothing more than a method of conducting a partial enforcement analysis.

Nor do I find persuasive the lead opinion's suggestion that the facial approach is unworkable in the time-sensitive posture typical of lawsuits that seek to enforce covenants not to compete. Refined to bare essence, the lead opinion's suggestion rests on the dubious proposition that the facial approach demands much more extensive discovery than the as-applied approach. And to the extent that this proposition has any validity, it is undermined by the fact that preliminary injunctive relief normally does not require definitive resolution of underlying claims but, rather, requires only a prediction of whether the party seeking such relief is likely to succeed on the merits. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996).

With my prediction that the Rhode Island Supreme Court would take a facial approach to the reasonableness inquiry, the other pieces of the puzzle fall easily into place. The court below supportably found that Lavin failed to show that CVS engaged in either bad faith or deliberate overreaching when requiring him to sign the covenant. See CVS Pharmacy, Inc. v. Lavin, 384 F. Supp. 3d 227, 237 n.9 (D.R.I. 2019). Accordingly, even if this court were to find the activity restriction in the covenant overly broad — a matter on which I take no view — I am confident that the Rhode

Island Supreme Court would partially enforce the covenant to the extent reasonably necessary to protect CVS's confidential information. Whatever the terms of such a modified covenant would be, those terms would most assuredly encompass Lavin's new position at PillPack.

There is one last hill to climb. The lead opinion says that it is hesitant to take the approach that I have outlined because no Rhode Island court has used the doctrine of partial enforcement in precisely this manner. See ante at 22-25. In the circumstances of this case, I have no such hesitancy: the Rhode Island Supreme Court has straightforwardly described partial enforcement as allowing courts to "modify an unreasonable covenant and enforce it to an extent that it is reasonably necessary to protect the promisee's legitimate interests." Durapin, 559 A.2d at 1058. That is exactly what my proposed use of the doctrine of partial enforcement accomplishes. Even if one assumes for argument's sake that the full activity restriction in the covenant is unreasonable, enforcing the covenant to bar Lavin from working at PillPack for an eighteen-month period would still be reasonably necessary to safeguard CVS's confidential information.

This reasoning does not extend Rhode Island law merely because it makes assumptions to avoid thorny questions about the extent of the reasonable scope of Lavin's covenant. Avoiding such unnecessary questions is a virtue of this approach, not a vice.

See <u>United States</u> v. <u>Gertner</u>, 65 F.3d 963, 973 (1st Cir. 1995) ("The judicial task, properly understood, should concentrate on those questions that must be decided in order to resolve a specific case."); <u>see</u> <u>also</u> <u>Corbin on Contracts</u>, <u>supra</u>, § 80.26 (approving this approach to conducting partial enforcement analysis).

In sum, I would hold squarely that Rhode Island law takes the facial approach for determining the reasonableness of a covenant not to compete. And I would affirm the district court's entry of a preliminary injunction on the basis of the partial enforcement doctrine.